Mary Ann KAUFMAN, Daniel T. Simcox, Charles G. Bloom, Robert Donaldson, Dolores R. Godley, Evelyn N. Jefferson, Joseph Kyle, Yvonne C. Kyler, Ronald J. McBride, Ralph G. Rutherford, James L. Wilson, Jr., Floyd Dubois and Francis Simal, Plaintiffs,

v.

BOARD OF TRUSTEES, COMMUNITY COLLEGE DISTRICT NO. 508 and Oscar Shabat, Defendants.

No. 81 C 2618.

United States District Court, N.D. Illinois, E.D.

Oct. 8, 1982.

See also, D.C., 522 F.Supp. 90.

Leon M. Despres, Despres, Schwartz & Geoghegan, Chicago, Ill., for plaintiffs.

Edward J. Karlin, R. Theodore Clark, Jr., Seyfarth, Shaw, Fairweather & Geraldson, George L. Siegel, Arvey, Hodes, Costello & Burman, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs, all of whom either are now or were, until they were discharged, tenured full-time faculty members employed by the City Colleges of Chicago, brought this civil rights action against the Board of Trustees of the City Colleges of Chicago, Community College District No. 508 ("the Board") and Oscar Shabat ("Shabat"), chancellor and chief administrator of the City Colleges, seeking declaratory and injunctive relief and compensatory and punitive damages on the ground that a rule prohibiting faculty members from engaging in concurrent full-time employment outside the Colleges is unconstitutional on its face and as applied in violation of the fourteenth amendment and the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983.[1] In an earlier opinion, this Court held that the rule against concurrent full-time outside employment, which is contained in the collective bargaining agreement between the Board and the Cook County College Teachers Union, Local 1600, is not unconstitutional on its face when infused with its common-sense meaning and that the rule is rationally related to a legitimate state interest. *Kaufman v. Board of Trustees Community College District No. 508,* 522 F.Supp. 90 (N.D.Ill.1981).[2] This matter is presently before the Court on the parties' cross-motions for summary judgment[3] with respect to plaintiffs' claims that, notwithstanding the facial validity of the rule, it has been applied in an arbitrary and capricious manner in violation of principles of substantive due process and equal protection.

1. Jurisdiction is asserted pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

2. In subsequent opinions, the Court clarified the scope of its ruling on the facial validity of the rule against concurrent full-time employment and denied defendants' initial motion to dismiss or, in the alternative, for summary judgment as premature. *Kaufman v. Board of Trustees, Community College District No. 508,* 522 F.Supp. 90, 96 (N.D.Ill. September 3, 1981). The Court also twice rejected plaintiffs' attempts to enjoin the state administrative hearing process under the Illinois Community Colleges Tenure Act, Ill.Rev.Stat. ch. 122, § 103B–4, pending the disposition of this case as well as defendants' motion requesting that the Court abstain from further proceedings in this case until the conclusion of the state administrative hearing process. *Id.; Kaufman v. Board of Trustees, Community College District No. 508,* No. 81 C 2618 (N.D.Ill. February 1, 1982). Furthermore, in all three of our previous opinions, we repeatedly rejected defendants' contention that plaintiffs be required to exhaust their state administrative remedies before being allowed to press their section 1983 claims in this Court. *Id. Cf. Patsy v. Board of Regents of the State of Florida,* —— U.S. ——, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (exhaustion of state administrative remedies not required as prerequisite to bringing an action pursuant to section 1983).

3. In a joint motion filed with the Court on January 22, 1982, the parties requested that they be permitted to file cross-motions for summary judgment and supporting memoranda of law, and that the filing of the pretrial order be stayed pending resolution of the cross-motions. The parties stipulated that there probably would be no real dispute as to the material facts in the instant case. Notwithstanding their stipulation, the parties—particularly defendants—proceeded to file a mountain of material that raises rather than resolves many factual disputes. As set forth more fully below, however, even if all factual disputes are resolved in defendants' favor, the undisputed *material* facts of record merit summary judgment for plaintiffs on the issue of liability. Fed.R.Civ.P. 56(c).

In support of a motion for summary judgment, the moving party has the burden of showing that there is no dispute as to any genuine issue of fact material to a judgment in its favor as a matter of law. *Cedillo v. International Association of Bridge & Structural Iron Workers, Local Union No. 1,* 603 F.2d 7, 10 (7th Cir.1979). The non-moving party is entitled to all reasonable inferences that can be made in its favor from the evidence presented. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Moutoux v. Gulling Auto Electric, Inc.,* 295 F.2d 573, 576 (7th Cir.1961).

Briefly stated, plaintiffs contend that defendants have acted arbitrarily and capriciously in violation of settled principles of substantive due process and equal protection of the laws in that they did not seriously enforce the rule against concurrent full-time employment from its inception in 1969 until November, 1980, despite the fact that they knew or should have known that violation of the rule was potentially widespread among City Colleges faculty. Plaintiffs maintain, however, that beginning in November, 1980, defendants revived the long-dormant rule without warning or notice and proceeded to discharge nearly 30 faculty members for violation of the rule, including most of the plaintiffs herein.[4] Plaintiffs also maintain that defendants have effectively exempted from the scope of the rule self-employed faculty members and those who are on the faculties of other area colleges while enforcing the rule against those who are employed by a third party and that they have never developed or applied any consistent standards in the course of their improvisational enforcement of the rule over the years.

Defendants deny that they had any long-standing prior knowledge of the full-time as opposed to part-time concurrent outside employment of the City Colleges faculty in general or of those faculty members who have been terminated since November, 1980, in particular. They maintain that they have assiduously enforced the rule against concurrent outside employment since its inception both with respect to those faculty members who are employed by another as well as those who are self-employed and those who are on the faculties of other area colleges.

The parties have submitted a wealth of material in support of their respective positions that the rule has or has not been applied in an unconstitutional manner. The Court has thoroughly sifted and reviewed the mass of material presented together with the legal memoranda submitted by counsel directed to the question of arbitrary and capricious enforcement of the rule. In our view, even if all actual or potential factual disputes are resolved in favor of defendants, the following undisputed material facts emerge. As set forth more fully below, these undisputed material facts merit summary judgment in favor of plaintiffs.

## I.

The rule against concurrent full-time employment was first incorporated in the collective bargaining agreement between the Board and the Cook County College Teachers Union in 1969. From its inception, the rule was actively opposed by the Union as well as by a sizeable segment of the faculty, though the Union ultimately acceded to the inclusion of the outside employment rule in the collective bargaining agreement. As currently set forth in Article VIII.E of the collective bargaining agreement, rule 2–201 provides:

A full-time position in the Colleges is accepted with the understanding that the faculty member will not continue, or at a future date accept, a concurrent full-time

---

4. The two plaintiffs who have not been discharged for violation of the rule contend that the rule has been applied so haphazardly in the past that they do not know how to plan their own activities so as to comply with the rule in the future. In an earlier opinion, we held that these plaintiffs had standing to challenge the rule on its face and as applied because of their interest in determining the parameters of the rule and in assuring that it is evenly enforced so that they might plan their own activities accordingly. *Kaufman v. Board of Trustees, Community College District No. 508, supra,* 522 F.Supp. at 101 n. 3.

position or positions equal to a full-time position with any other employer or employers while he is teaching full-time in the Colleges.

A virtually identical provision is also contained in the individual employment contracts signed by full-time faculty members at the City Colleges. Although the rule was promulgated in 1969, it was not until the fall of 1978 that the Board began requiring faculty members to fill out individual "outside employment forms" in which they were asked to disclose the nature and extent of their employment, consultation and research outside the City Colleges. The forms have been required in each academic semester since the fall of 1978 to date, with the exception of the fall 1979 and spring 1980 semesters.

It is undisputed that concurrent outside employment is widespread among the faculty of the City Colleges and that this state of affairs has long been known to and tolerated, if not expressly encouraged, by defendants.[5] As this Court noted in an earlier opinion, defendants' toleration and even possible encouragement of such outside employment is not surprising since a faculty member with concurrent outside employment in his or her field of expertise is both able to supplement his or her moderate income from the City Colleges and bring experience drawn from the field into the classroom to the benefit of the City Colleges' student body as a whole. *Kaufman v. Board of Trustees, Community College District No. 508, supra,* 522 F.Supp. at 100.

Defendants maintain, however, that they have never knowingly acquiesced in the concurrent *full-time,* as opposed to *part-time,* outside employment of a faculty member within the meaning of the rule at issue in this case. Plaintiffs, of course, contend otherwise.

In any event, it is undisputed that from the time the rule was adopted in 1969 until November, 1980, no tenured faculty member affiliated with the City Colleges was dismissed for engaging in concurrent full-time outside employment in violation of the rule.[6] During that eleven-year period, defendants received information both anonymously and, in some cases, voluntarily from the affected faculty member himself that a handful of faculty members, certainly not more than a dozen depending upon whether plaintiffs' or defendants' figures are used, might be engaged in concurrent full-time employment in violation of the rule. The City Colleges administration investigated each case and most of the faculty members involved were found not to be in violation of the rule. Of those who were determined to be in violation of the rule, two or three chose to resign from the City Colleges, with the approval of the Board, rather than discontinue their outside employment. A few others chose to resign their outside positions and remain with the City Colleges, again with no objection from the Board. No further disciplinary action was taken with regard to any of these individuals.

**5.** As defendants concede at page 6 of their reply brief in support of their motion for summary judgment, "[p]laintiffs are perfectly correct in noting that Defendants 'knew outside employment to be a way of life' for some faculty members and 'tolerated it' from 1969 to 1980." *See also* defendants' initial brief in support of their motion for summary judgment at page 25, n. 12: "[t]here is no question that the administration has always known that a large number of faculty members held outside employment."

**6.** Defendants contend that Marilyn Preston Killingham was terminated in 1974 for violation of the rule against concurrent full-time employment. Plaintiffs maintain that Ms. Killingham was dismissed for reasons unrelated to any

outside employment she might have had. It is undisputed, however, that Ms. Killingham was an *untenured* faculty member and that she was thus not similarly situated to plaintiffs or the other faculty members who have been terminated or disciplined under the rule. Defendants also contend that William Townsend was dismissed in 1968, before the promulgation of the rule, for maintaining concurrent full-time outside employment. It is not clear why Mr. Townsend's dismissal would be relevant to the question of defendants' application of a rule that was adopted *after* his dismissal occurred but, in any event, it is undisputed that the dismissal resolution was withdrawn and Townsend was allowed to resign from the Colleges at the conclusion of the fall 1968 semester.

In the spring of 1979, however, Chancellor Shabat recommended to the Board that faculty member Emmett Cosey be dismissed for violation of the rule against concurrent full-time employment. A special committee of the Board held a hearing with respect to the charges in May, 1979, and instead resolved to adopt severe sanctions short of dismissal against Cosey.[7] The Board's resolution also included a statement to the effect that "the Board of Trustees reserves the right to consider dismissal of a full-time faculty member who holds an outside full-time job or its equivalent." There appears to be some dispute with respect to whether or not the Board's decision in the Cosey matter was widely known among the City Colleges faculty. There does not appear to be any question, however, that any dissemination of the Board's decision and resolution in the Cosey case to the faculty at large would have been through informal channels within the Colleges rather than by formal Board action.

Then, in November and December, 1980, approximately a year and a half after the Cosey matter, the Board adopted dismissal resolutions for three full-time faculty members—Yvonne Kyler, Caroline Brown and Aldo Perri—all of whom were alleged to have violated the rule against concurrent full-time employment and misrepresented the extent of their outside employment on the Board's outside employment forms.[8] Within the next year, both before and after the filing of the instant suit on May 15, 1981, the Board adopted dismissal resolutions for approximately 30 more City Colleges faculty members, including ten of the plaintiffs herein, for alleged violation of the rule against concurrent outside employ-

ment. Most of those who were dismissed over the last two years, including all but one of the plaintiffs who were terminated, were also dismissed for falsely certifying that they had no outside employment on the Board's outside employment forms.

Plaintiffs urge that this dramatic turnabout in the enforcement of the rule allegedly without adequate notice or warning, after a period during which the rule was not actively enforced and the faculty was effectively lulled into a false sense of security with respect to defendants' position as to outside employment, violates established principles of substantive due process and equal protection. Defendants maintain that although they have been somewhat constrained in their enforcement of the rule by their limited investigatory resources, they have been consistent and aggressive in their enforcement of the rule since its inception and they have never failed to enforce the rule in the fact of notice that it was being violated. Defendants' assertions, however, are belied by the undisputed facts of record in this matter as well as by certain of their own inconsistent arguments and theories of this case.

Even apart from the question of defendants' enforcement of the rule prior to the fall of 1978 when they began requiring the faculty to file forms disclosing the nature and extent of their outside employment, consultation and research,[9] it is clear that at least after that time, defendants possessed sufficient data by which they could have begun to monitor the faculty's compliance with the rule simply by reviewing the responses of individual faculty members on those forms. Yet defendants apparently did not review the outside employment

7. Instead of dismissing Cosey, the Board resolved to suspend him for one year, forfeit his automatic pay increase for 1980–81, and render him ineligible for advancement for a period of five years.

8. Kyler, Brown and Perri each requested a hearing regarding their dismissals as was their right under the Illinois Community College Teachers Tenure Act, Ill.Rev.Stat. ch. 122, § 103B–4. The dismissals of Brown and Perri were upheld following a hearing under the Act. Although a hearing has been held in Kyler's

case, the parties have not advised the Court of a decision in her case as of yet. Kyler is also a plaintiff in the instant suit.

9. As noted above, between 1969 and 1978, only a handful of teachers were investigated for violation of the rule against concurrent outside employment and none were disciplined. Those few who were investigated were either exonerated or allowed to resign one or the other of their full-time jobs without penalty.

forms in any detail nor did they engage in any meaningful follow-up of the non-responsive or evasive answers they got from a number of faculty members. Rather, it has only been since plaintiffs filed this lawsuit, and perhaps immediately prior to that time, that defendants have begun to use the resources that have always been at their disposal to investigate in any meaningful way the faculty's compliance with the rule.

For example, between 1978 and 1980, defendants frequently received outside employment forms with no information other than a faculty member's signature and the date, or with brief disclaimers stating that the form was "not applicable" to the individual faculty member, that he or she had "no outside consultation," or that he or she asserted a "fifth amendment privilege" in response to the Board's inquiry. Other faculty members stated, without elaboration, that they were "not employed by any outside institution[s]" or that they were not employed by a third party though they had unspecified self-employment. Although defendants make much of the fact that they sent about 60 follow-up letters to some of those who filed such "non-responses" in 1978, there is no evidence that defendants attempted to follow-up the non-responses or evasive and vague answers they continued to receive during 1979 and 1980 in those semesters in which the forms were required of the faculty. Indeed, rather than heightening their scrutiny of the forms or tightening their follow-up procedures in those years, defendants temporarily discontinued the use of the outside employment forms altogether during the fall of 1979 and spring of 1980 only to reinstitute the procedure in the fall of 1980.

The lax enforcement of the rule between 1978 and November, 1980, and the rather abrupt turnabout thereafter, is further illustrated by the fact that between 1978 and 1980, at least four faculty members reported that they worked between 25 and 30 hours per week in jobs outside the City Colleges on their outside employment forms without eliciting any comment whatsoever from those charged with enforcing the rule. In 1981 and early in 1982, these same faculty members were discharged for violation of the outside employment rule along with others who worked between 25 and 30 hours per week or more in employment outside the City Colleges. Although defendants have never expressly articulated a standard number of hours of outside employment that they would consider to be equivalent to a concurrent full-time position under any and all circumstances, the largest category of faculty members who have been terminated for violation of the rule during the past two years were employed by the Chicago Board of Education as public school teachers working at least 30 hours per week in the Chicago school system in addition to their full-time teaching load of 12 to 13 classroom hours at the City Colleges.[10] It would thus seem fair to say that the disclosures by other faculty members that they had concurrent employment of up to 30 hours per week between 1978 and 1980 should have spurred some interest on the part of those charged with enforcing the rule if it was truly being consistently and aggressively enforced during that period as

10. Defendants have never articulated a standard number of hours that they consider to be full-time employment. Rather, they purport to look at a variety of factors in determining whether an outside work commitment is full- or part-time as those terms are commonly used and understood. Admittedly, such a process is not foreclosed by our earlier opinions on the facial validity of the rule in which we discussed the necessity of being manageably brief in enunciating a rule of conduct, yet specific enough to warn of what is and is not permitted and flexible enough to achieve the desired purpose. *See, e.g., Kaufman v. Board of Trustees, supra,* 522 F.Supp. at 102.

Within this framework, defendants have acted to terminate members of the City Colleges faculty who were found to have been engaged in employment by a third party outside the Colleges of between 25 and 30 hours a week or more, depending upon the nature of the work and the facts of a particular faculty member's case. Defendants have not, however, acted to terminate self-employed professionals who acknowledge working up to 25 hours per week in their professional capacity on the ground that such persons are not engaged in concurrent full-time employment.

defendants maintain. Yet, such disclosures did not spark any inquiry until years after they were made and, for the most part, until after this case was filed.

For example, in the fall of 1978 Clarence Brown reported that he worked 20–25 hours per week as a tax consultant over and above his full-time teaching responsibilities at the City Colleges. He reported working up to 30 hours per week in the fall of 1980 and 20–25 or 26 hours per week in 1981. He was not terminated until February, 1982, for violation of the outside employment rule. Another faculty member, John Porter, reported that he worked up to 30 hours a week as an accountant in the fall of 1978, spring of 1979 and fall of 1981. On his other outside employment forms he reported vaguely that his outside employment was "variable, less than full time." Porter was terminated in December, 1981, about three years after he first reported outside employment of up to 30 hours per week.

In addition, Joseph Kyle, a faculty member who was also employed by the Illinois Department of Human Rights, reported that he worked 24–30 hours per week for the state in 1978, 16–24 hours per week in 1979 and 1980 and 20–24 hours per week in 1981. He was terminated in early July,

1981, almost three years after he first reported the extent of his outside employment and a month *after* he stopped working for the Department of Human Rights. Finally, faculty member Floyd Dubois reported that he was also employed by the Chicago Board of Education as a substitute teacher for 28⅓ hours per week between 1978 and 1981. He was not terminated for such employment until April, 1981.[11]

Defendants argue that at least three of the individuals named above—John Porter, Joseph Kyle and Floyd Dubois—actually worked more hours at their outside jobs than they reported on their outside employment forms, implying that those faculty members were terminated because only the increment over and above the number of hours they reported brought them within the ambit of the rule against concurrent full-time employment. But even if defendants are correct in their assertion that these faculty members actually worked more hours at their outside jobs than they reported, the information defendants rely on with respect to faculty members Kyle and Dubois did not surface until *after* they were discharged so that information could not have figured in defendants' decisions.[12] Moreover, even if John Porter did work

11. Plaintiffs also assert that although faculty member Harry Hirschhorn reported that he worked up to 30 hours per week training and breeding dogs in connection with his own business, "Nimrod Dogs," from 1978 through 1981, defendants have not found him to be in violation of the concurrent employment rule. *See* Affidavit of Mary Ann Kaufman at ¶ 11 (filed 4/5    182). Defendants contend that they investigated an allegation that Hirschhorn "had concurrent full-time employment as an engineer" but found that allegation to be without merit. *See* Affidavit of W. Rasmussen Holm at ¶ 11 (filed 2/23/82). If plaintiffs are correct in their assertion with respect to Hirschhorn, an assertion that on the record before us stands unrebutted, it is difficult to see why a person who spends 30 hours a week raising dogs should be treated any differently under the concurrent employment rule than a public school teacher who works 30 hours a week for the Board of Education or other faculty members who also report outside employment of up to 30 hours per week.

12. Kyle was terminated on July 7, 1981. Plaintiffs' amended complaint filed on July 20, 1982,

however, which defendants apparently rely on in their reply brief, states that Kyle actually worked between 24 and 37 hours per week for the Illinois Department of Human Resources. But in his affidavit dated February 17, 1982, Kyle avers that he accurately reported his outside employment on the Board's forms from 1978 through 1981, notwithstanding the statements in the amended complaint.

Dubois was terminated on April 7, 1981. In his affidavit dated February 16, 1982, however, on which defendants rely in their reply brief, Dubois states that he actually worked more hours per week as a day-to-day substitute teacher between 1978 and 1980 than regularly assigned teachers did during that period. He states further that he worked fewer hours per week when he became a regularly assigned teacher in 1981 than he had previously worked as a substitute. Dubois also states, however, that he always reported the extent of his outside employment accurately on the Board's forms during this period as both a substitute and regularly assigned teacher.

more than the 30 hours per week that he consistently reported on his outside employment forms as defendants maintain, the 30 hours that he reported should have been enough to bring him within the reach of the outside employment rule as it has been applied by defendants. *See* note 10 and accompanying text, *supra*. Accordingly, defendants must be deemed to have had at least constructive knowledge of potential violations of the concurrent employment rule as early as 1978 without having taken any action to enforce the rule in that regard until recently.

Between 1978 and 1980, and beyond, defendants also did nothing when they were confronted with responses on the outside employment forms by certain self-employed faculty members who clearly understated the total number of hours they devoted to work outside the City Colleges. For example, one self-employed accountant reported that he worked 15 to 20 hours a week "excluding administrative work." Another self-employed psychologist reported 16 to 17 "patient hours" while still another reported "19.39 billed hours, never more than 25." These responses did not invoke any response from defendants despite their announced position that a faculty member who carries a load of 12 to 13 classroom hours effectively works full-time because of the large number of non-class hours of preparation and review that are necessary for each hour spent in class. In view of defendants' position with respect to the extracurricular time required of a college teacher, it would also seem to follow that self-employed professionals would be required to spend time over and above their "billable," "client" or "patient" hours doing administrative work and various other types of background and preparatory work in order to adequately perform their professional duties. Yet defendants have continually accepted at face value the representations of self-employed professionals that their "billable" or "patient hours" constitute their entire commitment to their employment activities outside the City Colleges. Such failure to investigate what appear on their face to be obvious evasions of the reporting requirements compel the strong inference that defendants have not applied the rule with any consistency particularly with respect to self-employed persons as compared to others who hold outside employment with a company or firm.

Although defendants argue that they have assiduously enforced the rule against concurrent outside employment since its inception in 1969, they also argue—somewhat inconsistently—that the Board formulated a new policy for enforcing the rule in mid-1979 which has been applied since that time. According to W. Rasmussen Holm, Director of Labor Relations for the City Colleges of Chicago, the unwritten new policy formulated by the Board holds that when an investigation reveals that a faculty member has been engaged in concurrent full-time employment in violation of the rule subsequent to May, 1979, that faculty member will be dismissed. Under the Board's purported new policy, however, a faculty member who is discovered to have been engaged in concurrent full-time employment prior to May, 1979, will only be suspended for that violation of the rule as will a faculty member who merely failed to disclose the true extent of his or her part-time employment since May, 1979, on the Board's outside employment forms. According to Holm, those faculty members who failed to disclose the true extent of their part-time employment on the Board's forms prior to May, 1979, will not be disciplined at all. Affidavit of W. Rasmussen Holm at ¶¶ 18–20 (filed 2/23/82).

The purported new policy for enforcing the outside employment rule detailed by Holm in his affidavit apparently was never embodied in writing or officially circulated among the faculty, nor was it mentioned by Chancellor Shabat or Arnold Jones, Vice-Chancellor for Personnel, in their affidavits also filed in support of defendants' motion. Moreover, the purported new policy was not mentioned by Holm himself in his testimony during an arbitration hearing concerning the dismissal of plaintiff Yvonne Kyler in February, 1981. In fact, in the two academic semesters immediately following the

supposed adoption of the new policy, the Board temporarily discontinued use of the outside employment forms on which faculty members were asked to disclose the nature and extent of their outside employment, consultation and research, raising at least some question with respect to how defendants intended to enforce those aspects of the new policy calling for sanctions for misrepresentations as to "the extent of [a faculty member's] part-time outside employment *on the Board's Outside Employment forms....*" Affidavit of W. Rasmussen Holm at ¶¶ 19 and 20 (emphasis supplied). Indeed, plaintiffs assert that the "new" policy put forth by Holm in his affidavit is really just a post-hoc rationalization for defendants' conduct since November, 1980, and not a very consistent or persuasive rationalization at that.[13]

Nevertheless, assuming for the sake of argument that defendants did formulate a new enforcement policy in May, 1979, the undisputed facts clearly show that they did not actively or consistently enforce the rule in accordance with the purported new policy after its adoption. For example, as discussed above, defendants did not require faculty members to file outside employment forms during the two academic semesters immediately following the adoption of the new policy even though the new policy as explained by Holm purports to provide sanctions for those who fail to disclose accurately the extent of their part-time employment on those forms. As discussed above,

without the outside employment forms, it would be impossible to enforce the disclosure aspects of the "new" policy. Moreover, although defendants were aware as early as November, 1979, that faculty member Yvonne Kyler was potentially in violation of the outside employment rule by virtue of her concurrent position as a recreation supervisor with the Chicago Park District,[14] they did nothing regarding the potential rule violation for five months until March, 1980, when Shabat wrote a letter of inquiry to the Park District. Defendants waited another seven months for a reply and the Board finally passed a resolution dismissing Kyler in November, 1980. Such delay in the face of actual knowledge of a potential violation of the rule is starkly inconsistent with defendants' argument that the rule was actively enforced during that time period.

Defendants also failed to act with any degree of alacrity on allegations of potential violations of the rule made during the course of Yvonne Kyler's arbitration hearing soon after the new policy was supposedly adopted.[15] At the beginning of her hearing in February, 1981, Kyler's counsel (who also represents Kyler and the other plaintiffs in the instant case) presented defendants with a "Notice to Admit" that approximately 60 listed faculty members, most of whom were self-employed, were engaged in concurrent full-time employment in violation of the rule. The extent of defendants'

---

**13.** The Court rejects any suggestion that might be made to the effect that the contours of the purported new policy may be found in the one-line caveat in the Board's resolution concerning the Emmett Cosey matter stating that "the Board of Trustees reserves the right to consider dismissal of a full-time faculty member who holds an outside full-time job or its equivalent." *See* page 1147 *supra.* Even if that resolution were disseminated among the faculty generally as defendants contend, it gives no indication of a change in as opposed to a continuation of the Board's policy concerning concurrent outside employment and is insufficient as a matter of law for the purpose of advising a reasonable person as to any such change in policy or the content of such a new policy. Moreover, it is difficult to understand how defendants could rely on the Cosey resolution as providing notice of their new enforcement policy which, according to Holm, was formulated "*after* the May 1, 1979 Emmett Cosey resolution...." Holm Affidavit at ¶ 18 (emphasis supplied).

**14.** Chancellor Shabat apparently learned of Kyler's concurrent employment from an article and accompanying photograph in the Chicago *Daily Defender* announcing Kyler's promotion to the position of area recreation supervisor and stating that she was the first black woman to hold that position. The article appeared in the *Defender* in November, 1979.

**15.** In order to prevent the Board's dismissal resolution from becoming final, Kyler sought and obtained a hearing before an independent arbitrator as provided by Illinois statute. *See* Ill.Rev.Stat. ch. 122, § 103B–4.

investigation of Kyler's charges was to send letters to the listed faculty members inquiring whether or not "[plaintiffs' counsel's] statement" that the faculty member is engaged in concurrent full-time employment "is accurate." Predictably, defendants received rote negative responses from most of the faculty members to whom the letters of inquiry were addressed stating that the individuals involved did not have concurrent full-time outside employment. Shabat then wrote back to these faculty members thanking them for their cooperation. That ended the matter as far as defendants were concerned and they made little if any further follow-up investigation of Kyler's charges. It was only after this suit was filed in May, 1981, and after this Court's opinion denying defendants' initial motion to dismiss or, in the alternative, for summary judgment dated June 30, 1981, that defendants engaged in a more active investigation of the charges of widespread violations of the rule at the City Colleges, eventually disciplining ten of those faculty members initially named during the Kyler hearing for failure to report the extent of their outside self-employment.

It is also undisputed that defendants have not used the same methods of investigation or applied the same standards with respect to those self-employed faculty members who are suspected of violating the concurrent employment rule as have been used in investigating and evaluating those who are employed by another since November, 1980. For example, defendants accept without further investigation the representations of some faculty members regarding their professional commitments which, on their face, indicate open-ended professional commitments beyond the number of hours reported. Although defendants consider the 12 to 13 classroom hours required of a full-time faculty member to be only a portion of his or her professional commitment, in addition to the many hours that must be spent in preparation for class or in reviewing students' work, they readily accept the representations of self-employed professionals (such as psychologists or accountants) to the

effect that their client or patient hours constitute the full extent of their outside commitments without any allowance for administrative work or other non-patient or non-client time spent. Furthermore, although defendants have required those faculty members who are employed by a third party to bring in their income tax returns and W–2 forms in order to substantiate the number of hours of outside employment they report on their outside employment forms, defendants have required little, if any, substantiation from self-employed faculty members with respect to their reported outside commitments.

To be sure, we would be less than candid were we to imply that there are no disputed facts in the voluminous record of deposition testimony, affidavits and exhibits compiled by the parties and submitted in connection with the pending cross-motions for summary judgment. For example, an obvious dispute exists with respect to whether certain City Colleges administrators had prior, personal knowledge that some of the plaintiffs held outside jobs and the number of hours they worked in connection with such jobs long before those plaintiffs were terminated for the very same outside employment. Both sides have submitted conflicting affidavits of the persons involved in support of their respective positions on that issue. Another patent dispute is created by conflicting affidavits concerning alleged encounters between Shabat and certain of the plaintiffs in connection with the application of the rule.

In the Court's view, if plaintiffs' version of the facts and events surrounding the enforcement of the concurrent employment rule over the past 13 years was ultimately borne out at trial, they undoubtedly would have a much stronger case than that which appears from the undisputed material facts in the record at this stage of the proceedings. But, even at this juncture, if we resolve all doubts and make all reasonable inferences in favor of defendants, the undisputed material facts of record set forth

above still compel the conclusion [16] that the concurrent employment rule was not seriously enforced for the first decade or so of its existence despite the fact that defendants knew or should have known of at least potential violations of the rule among the faculty during that time for which faculty members have only recently and belatedly been disciplined. When the rule was given life by defendants, it was applied haphazardly by them as between those faculty members who were and are employed by third parties vis-a-vis those who are self-employed as well as with respect to similarly situated faculty members employed by third parties. The undisputed material facts further indicate that defendants have never had a clearly defined policy with respect to their enforcement of the concurrent employment rule and that, as a result, they have continually improvised their enforcement of the rule to meet changing needs, pressures and events.

## II.

■ As tenured faculty members, those plaintiffs who were terminated under the concurrent employment rule were entitled to the full panoply of rights secured by the due process clause of the fourteenth amendment. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Moreover, as the Supreme Court itself made clear in the context of a teacher discharge case, *Harrah Independent School District v. Martin,* 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979), the due process clause embodies both procedural safeguards against state infringement upon life, liberty and property as well as more substantive protections against the arbitrary and capricious disregard of those rights by the state. Courts at all levels of the federal system have tested the actions of school board officials in terminating tenured faculty members against established substantive due process principles requiring that official action not be arbitrary, capricious or without rational basis. *See, e.g., Harrah Independent School District v. Martin, supra; Gosney v. Sonora Independent School District,* 603 F.2d 522 (5th Cir.1979); *Brenna v. Southern Colorado State College,* 589 F.2d 475 (10th Cir.1978); *Bignall v. North Idaho College,* 538 F.2d 243 (9th Cir.1976); *Dean v. Timpson Independent School District,* 486 F.Supp. 302 (E.D.Tex.1979); *Lewis v. Delaware State College,* 455 F.Supp. 239 (D.Del. 1978).[17] Furthermore, in the context of allegations that similarly situated persons have been treated differently, substantive due process considerations are virtually co-extensive with the equal protection guarantees of the fourteenth amendment. *Harrah Independent School District v. Martin, supra; Gosney v. Sonora Independent School District, supra.*

■ In the instant case, on the basis of the undisputed material facts discussed in the first section of this opinion, we conclude that defendants did not act in accordance with these settled principles in applying the rule against concurrent full-time outside employment. Although, as the court noted in *Bignall v. North Idaho College, supra,* 538 F.2d at 245, "[d]ue process is a flexible,

16. Summary judgment has been held to be an appropriate procedural vehicle for the disposition of even the most complex cases short of trial when all reasonable doubts and inferences are resolved in favor of the party opposing the motion and the undisputed material facts support the position of the moving party as a matter of law. *Mid-West Paper Products Company v. Continental Group, Inc.,* 596 F.2d 573, 579 (3d Cir.1979); 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2727 at 527–28 (1973).

17. Defendants' contention that "substantive due process [is] a concept which has long been viewed with strong disfavor by the federal courts," Defendants' Reply Brief at 4, is thus without merit. Moreover, their citation of dicta from then-Judge Stevens' opinion for the courts in *Jeffries v. Turkey Run Consolidated School District,* 492 F.2d 1, 3–4 (7th Cir.1974), would seem to lack whatever minimal force it may have had in light of the Court's decision in *Harrah Independent School District v. Martin, supra,* in which now-Justice Stevens joined a unanimous Court in applying substantive due process analysis in a case in which a tenured teacher alleged that she had been terminated in an unconstitutional manner.

pragmatic concept," defendants' enforcement of the concurrent full-time employment rule in this case has been far too flexible and haphazard to meet constitutional requirements. Rather, the evidence conclusively suggests that defendants' attitude toward enforcement of the rule over the years has changed repeatedly without adequate notice to the faculty so that they might plan their conduct accordingly.

During the first ten years of its existence, for example, the rule was never invoked unless defendants were squarely presented with a potential violation either through an inquiry by an interested faculty member as to whether his or her own conduct complied with the rule or through an anonymous tip that a particular faculty member was in violation of the rule. But even when a violation of the rule was discovered during this period, the offending faculty member was not disciplined. Rather, he or she was allowed to quietly resign his or her outside position and remain with the City Colleges if he or she chose to do so. By contrast, apparently none of those faculty members who were discharged after November, 1980, were given the choice of remaining with the City Colleges, including those who had already resigned their concurrent outside position (e.g., Joseph Kyle, Evelyn Jefferson, etc.).

Defendants' contention that they lack the resources to enforce the rule in an efficient, comprehensive manner is belied by the increasingly more elaborate and costly methods they have instituted and applied in enforcing the rule in recent years, to say nothing of the substantial amount of money they have spent litigating this case instead of formulating a rational, consistent enforcement scheme. Furthermore, enforcement of the rule could have been markedly improved by the expenditure of only minimal resources if defendants had consistently applied procedures that they had instituted and utilized information that was at their disposal instead of ignoring apparent abuses.

Defendants themselves seem to concede that enforcement of the concurrent employment rule was less than adequate prior to 1979 with their contention that a new policy for enforcing the rule was formulated in the spring of that year which purportedly gave a partial reprieve to those faculty members who violated the rule before that date and total amnesty to those who failed to report the extent of their part-time employment during the earlier period. But the adoption or existence of this new policy was never formally announced to the faculty nor were the parameters of the supposed new enforcement scheme made known in any meaningful way. Moreover, as discussed in more detail above, defendants' enforcement of the rule since the spring of 1979 has been extremely arbitrary. Faculty members who accurately reported the extent of their outside employment for years have only recently been dismissed for conduct in which defendants had long acquiesced by their silence. Others who appear to be similarly situated have been ignored. In addition, self-employed faculty members are judged by different standards than those applied to those employed by another and allowed to engage in what on its face appears to be substantial outside employment activities without reprisal.

Despite defendants' representations and this Court's previous holding to the effect that the rule against concurrent full-time outside employment is facially valid and capable of consistent, rational enforcement, defendants have never developed or applied a coherent standard for enforcing the rule or communicated such a standard to the faculty. Rather, they have continually improvised to meet their own changing agenda. In similar situations, other courts have found that such conduct fails to meet the minimum requirements of substantive due process and equal protection under the fourteenth amendment. See, e.g., Gosney v. Sonora Independent School District, supra; Dean v. Timpson Independent School District, supra; Lewis v. Delaware State College, supra.[18]

18. In their opening brief, defendants argued that plaintiffs should be held to the burden

placed on criminal defendants who allege that

Defendants also contend that Chancellor Shabat may not be held liable in this case because he is entitled to qualified immunity for acts taken in his capacity as a public official. *Wood v. Strickland,* 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). They maintain that there is no evidence that Shabat personally dismissed any faculty members or that, even if he did, he acted with any impermissible motivation so as to justify piercing his qualified immunity.

Contrary to defendants' assertions, however, there can be no dispute that Shabat was integrally involved in every step of the process of enforcing the concurrent employment rule right up to the point at which the Board formally acted to terminate individual faculty members on the basis of Shabat's recommendations. Shabat's affidavit itself makes clear the extent of his involvement in the enforcement process. Although he admittedly is not empowered to discharge faculty members, he is empowered to impose disciplinary sanctions short of termination for violation of the rule, and he has done so on several occasions. Moreover, Shabat concedes that he does have "the authority to recommend to the Board . . . that specific faculty members be dismissed, if I believe cause exists for the termination." Affidavit of Oscar E. Shabat at ¶ 5 (filed 2/23/82). Shabat's recommendation is apparently given great weight by the Board since on only one occasion in the past 13 years (that of Emmett Cosey) has the Board failed to act in a manner that is consistent with his recommendation.

■ Secondly, as the Supreme Court held in *Wood v. Strickland, supra, Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and subsequent cases, an official in Shabat's position:

is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiffs] or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [plaintiffs].

*Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. at 1001. *See also Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Trapnell v. Riggsby,* 622 F.2d 290, 294–95 (7th Cir.1980). The qualified immunity enunciated in *Wood* and *Scheuer* is phrased in the disjunctive, with both "objective" and "subjective" components. In the instant case, defendants contend that there is no evidence of Shabat's subjective lack of good faith in acting with the malicious intention to cause injury to plaintiffs, and we acknowledge that at the very least material factual questions exist in that regard.

■ On the basis of the undisputed evidence in the record, however, there is no question that Shabat's enforcement of the concurrent employment rule in an arbitrary and capricious manner was with actual or constructive knowledge that such actions would violate the constitutional rights of the plaintiffs and similarly situated faculty members. Defendants do not dispute that plaintiffs and the other faculty members whom Shabat recommended for dismissal were tenured and thereby entitled to the full panoply of due process protections. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Accordingly, we cannot conclude that Shabat is entitled to the qualified immunity accorded to public officials who act both subjectively

they are the victims of selective prosecution by the government on the basis of some impermissible consideration such as race, religion or the desire to prevent the exercise of a constitutional right. *United States v. Saade,* 652 F.2d 1126 (1st Cir.1981); *United States v. Falk,* 479 F.2d 616 (7th Cir.1973); *United States v. Phillips,* 525 F.Supp. 1 (N.D.Ill.1981). Obviously, how-

ever, these cases dealing with prosecutorial misconduct have no bearing on this civil rights action. Defendants have apparently abandoned this line of argument in their reply brief, responding instead to plaintiffs' substantive due process and equal protection claims on the merits.

*and* objectively in good faith under the law.[19]

### III.

One final question remains with regard to the relief, if any, to which each of the individual plaintiffs might be entitled as a consequence of our determination that defendants' enforcement of the concurrent employment rule violates established notions of due process and equal protection. As the parties have not briefed or argued the relief issue, we merely set forth some of our concerns in that regard.

Although the Court has stated on previous occasions that it did not plan to conduct a series of individual hearings concerning the peculiar circumstances of each of the eleven plaintiffs who were dismissed under the rule prohibiting concurrent full-time outside employment, it now appears that at least some kind of an individualized inquiry may be necessary in order to determine whether particular plaintiffs are entitled to any relief and the form that such relief, if any, might take. For example, ten of the eleven plaintiffs who were terminated for violations of the concurrent employment rule, were also purportedly discharged for failing to disclose that they had concurrent employment on the Board's outside employment forms. The effect of such non-disclosures in the face of our determination that defendants had arbitrarily applied the concurrent employment rule and virtually ignored previous disclosures of outside employment of up to 30 hours a week is unclear. An issue might also arise as to whether some of these plaintiffs actually failed to report concurrent full-time as opposed to part-time employment. Moreover, defendants have apparently conceded that at least one of the discharged plaintiffs, Floyd Dubois, accurately reported the extent of his outside employment on the Board's forms, which arguably puts him in a slightly different category with respect to any potential relief. Another plaintiff, Joseph Kyle, might also be in a similar position. `

Furthermore, the two plaintiffs who have not been terminated, Mary Ann Kaufman and Daniel Simcox, stand in a much different position than the other plaintiffs with respect to any potential relief as might plaintiff Yvonne Kyler once the arbitrator hands down a decision in her case. Substantial questions also exist with respect to whether any of the discharged plaintiffs would be entitled to reinstatement, back pay or other consequential damages, resolution of which would depend on the circumstances of each individual case. The form of any prospective injunctive or declaratory relief, should that be necessary, is also an open question at this juncture.

In sum, a variety of complicated questions exist with respect to any potential relief for plaintiffs. Now that the liability portion of this case has been determined, it might behoove all parties concerned to sit down together and try to resolve the remaining matters without the rancor that has characterized their previous exchanges. In that regard, as soon as practicable after reviewing this opinion, the parties are directed to meet between themselves to discuss a speedy and fair resolution of this matter short of continued litigation. This resolution could be in the form of settlement, mediation by a third party or arbitration, any of which will spare the parties the added expenditures of time and money in continuing this litigation.

Accordingly, plaintiffs' motion for summary judgment is granted on the issue of liability and defendants' cross-motion is denied. The parties shall appear for a status in this matter on November 23, 1982, at 10:30 a.m., at which time they shall report to the Court with respect to the possibility of settling, or otherwise disposing of, the. remaining aspects of this case. It is so ordered.

**19.** Defendants acknowledge that the question of Shabat's qualified immunity can be established on a motion for summary judgment, citing *Butz v. Economou,* 438 U.S. 478, 507–08, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). *See also Procunier v. Navarette, supra,* 438 U.S. at 566, 98 S.Ct. at 862.