Phillip NICOLETTI, et al., Plaintiffs,

v.

Robert BROWN, et al., Defendants.

No. C87–1456.

United States District Court,
N.D. Ohio, E.D.

Oct. 29, 1987.

Walter J. Gerhardstein, David G. Latanick and Grant D. Shoub, Cloppert, Portman, Sauter, Latanick & Foley, Columbus, Ohio, for plaintiffs.

David J. Kovach, Office of the Atty. Gen., Cleveland, Ohio, for Robert Brown.

Shane Egan, Ohio Legal Rights, Columbus, Ohio, for Francis Johnson.

## MEMORANDUM OF OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

KRENZLER, District Judge.

This is an action for declaratory and injunctive relief pursuant to 42 U.S.C. §§ 1983 and 1988. The plaintiffs[1] are involuntarily committed mentally retarded persons residing at the Cleveland Developmental Center ("CDC"), a state operated institution for the mentally retarded and developmentally disabled. Named as defendants are Robert Brown, Director of the Ohio Department of Mental Retardation and Developmental Disabilities ("ODMRDD"),[2] Patrick Rafter, Chief of

1. The named plaintiffs are (a) Phillip Nicoletti, a 46-year-old mentally retarded male resident of CDC, through his parents, Michael (also legal guardian) and Nancy Nicoletti; (b) Frank Koniecdynski, a 65-year-old mentally retarded male resident of CDC, through his sister and legal guardian, Claire Gondiek; (c) Donna Marie Horvoth, a 51-year-old mentally retarded female, through her mother, Nancy Horvoth; and (d) Wayne and Wanda Cook, 31-year-old mentally retarded brother and sister, through their parents, Mary Ann (also legal guardian) and Andrew Cook. The named plaintiffs seek to bring this action on behalf of themselves and all other similarly situated persons at the CDC, and have requested the Court to certify this case as a class action pursuant to Fed.R.Civ.P. 23.

2. The authority and duties of the ODMRDD are found in Ohio Rev.Code Ann. §§ 5123.01, *et seq.* Ohio Rev.Code Ann. § 5123.03 states that "The department shall: (A) Maintain, operate, manage, and govern all state institutions for the care, treatment, and training of the mentally retarded...." Additionally, the ODMRDD is given powers not expressly enumerated in the statutes in the areas of executive, administra-

the Division of Developmental Centers, and Gregory Darling, Superintendent of CDC.

In their complaint, the plaintiffs allege that they have each been determined to be eligible for Medicaid intermediate care services for the mentally retarded ("ICF/MR" services). They also allege that they, in fact, received such services until November of 1986, at which time CDC lost its certification as an ICF/MR facility because defendant failed to maintain CDC in accordance with the standards established by Title XIX of the Social Security Act ("Title XIX"), 42 U.S.C. §§ 1396, et seq. (Supp. 1987). Plaintiffs contend that, since that time, they have merely been "warehoused" at CDC, an environment which they and various mental health experts have characterized as "hazardous" and "dangerous." Recently, plaintiffs allege, they have been informed that operations at CDC will be phased down over the next year; that approximately twenty (20) members of the CDC staff will be laid off, thereby further diminishing the level of care and services available to CDC residents; and that CDC residents will be relocated to other non-Medicaid certified facilities outside Cuyahoga County. Plaintiffs contend that such relocation will make it difficult for them to maintain contact with and receive visits from their families and loved ones, and that despite the transfers, they still will not be placed in Medicaid certified facilities. Upon receipt of notice of the impending phase down of CDC and the threatened transfer of CDC residents, plaintiffs initiated this suit.

Although the complaint in this case is far from a model of draftsmanship, it appears to the Court that plaintiffs attempt to set forth four separate, yet somewhat interrelated, claims for relief. First, plaintiffs contend that defendants have violated their rights under the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6000, et seq. (Supp.1987). Second, they contend that their rights under the Medicaid provisions of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq., have been violated. Third, plaintiffs allege that the conditions at CDC violate their fourteenth amendment due process rights to minimally adequate training, safety, and freedom from undue restraint as articulated in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Finally, plaintiffs allege that they have a protected property interest in being housed in an institution that meets the standards of Title XIX of the Social Security Act, and that they have been unconstitutionally deprived of this property interest.

In addition to requesting a declaratory judgment declaring that their rights under the foregoing statutory and constitutional provisions have been violated, plaintiffs also seek an injunction ordering that the defendants: (a) immediately improve the conditions at CDC so that CDC residents can be assured of their constitutionally protected liberty interests; (b) immediately seek Medicaid re-certification of the CDC; (c) allow residents to choose placement in another appropriate Medicaid-certified facility; (d) cease relocating Medicaid/ICF-eligible residents to non-Medicaid/ICF-certified facilities; and (e) cease laying off staff members at the CDC until the resident's rights can be guaranteed. Additionally, plaintiffs seek attorney fees and costs.

Following an initial hearing, the Court granted plaintiffs a temporary restraining order pursuant to Fed.R.Civ.P. 65(b). Subsequently, the defendants filed a motion to dismiss the action, pursuant to Fed.R. Civ.P. 12(b)(6), arguing that plaintiffs have failed to state a claim upon which relief can be granted. In deciding such motions, the Court must "take as true the material facts alleged" in the complaint, *Hospital Building Co. v. Trustees of Rex Hospital*, 425

tive, and fiscal supervision of the state institutions. Ohio Rev.Code Ann. § 5123.03(H).

Defendant Robert Brown, Director of the ODMRDD, derives his authority from Ohio Rev. Code Ann. § 5123.04. Included in his duties are the adoption of rules for the proper execution of the duties of the ODMRDD and the appointment of employees. Additionally, the director is given general supervisory powers over the two divisions of the ODMRDD, the division of administrative services and the division of mental retardation and developmental disabilities. Ohio Rev.Code Ann. § 5123.05.

U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976), and may dismiss an action only when it appears "beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). For the following reasons, defendants' motion to dismiss is hereby granted in part and denied in part. Each of the plaintiffs' four theories will be considered separately.

## I.

Plaintiffs' first claim for relief is predicated upon the Developmentally Disabled Assistance and Bill of Rights Act of 1975 ("Disabled Assistance Act"), 42 U.S.C. §§ 6000, *et seq.* (Supp.1987).[3] Plaintiffs contend that the Disabled Assistance Act gives them an entitlement to a "system to advance the rights of persons with developmental disabilities" and a right to "receiv[e] program services under an individual habilitation plan."[4] They contend that these rights have been violated by the defendants, and request this Court to issue appropriate declaratory and injunctive relief, ordering the defendants to implement a plan that will assure that all residents of CDC "receive appropriate program services under an individual habilitation plan and

have their rights as residents of CDC and as citizens advanced by defendants."

The defendants, in their motion to dismiss, argue that the Disabled Assistance Act does not provide the plaintiffs with any substantive rights upon which to base this action. The basis of defendants' argument is that the "rights" conferred by the Disabled Assistance Act are conditioned upon the state's acceptance of funds distributed under the Act. Additionally, the defendants argue that the United States Supreme Court's decision in *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("*Pennhurst I*"), holding that 42 U.S.C. § 6009[5] did not confer substantive rights upon the mentally retarded, is controlling in this case. The defendants also contend that the only relief available under the Disabled Assistance Act is the termination of federal funds, which was not requested by the plaintiffs.

The plaintiffs, in their memorandum in opposition to the defendants' motion to dismiss, respond that the holding in *Pennhurst I* covered only a narrow issue regarding the Disabled Assistance Act and does not preclude their claims. The plaintiffs additionally assert that the Disabled Assistance Act creates substantive rights which are enforceable through a private cause of action under 42 U.S.C. § 1983.[6]

**3.** A major revision of the Disabled Assistance Act occurred in 1984 with the enactment of Pub.L. No. 98–527, October 19, 1984, 98 Stat. 2662. All citations in this opinion are to the current sections of the Disabled Assistance Act. Where the Court makes references to sections of the Act mentioned in cases decided before the amendments, the Court has substituted the current statutory citations for the previous citations.

**4.** The plaintiffs state in their complaint and briefs that the rights which they allege have been denied them arise out of 42 U.S.C. §§ 6009 and 6011(a). The Court takes notice that these provisions of the Disabled Assistance Act have been amended and that the "rights" cited by the plaintiffs are not contained within the statutory citations given by them. 42 U.S.C. § 6009, entitled "Congressional finding regarding rights of the developmentally disabled," is the same statutory provision that was construed in *Pennhurst State School & Hospital v. Halderman*, 451 U.S.

1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). The Court finds that any arguments by the plaintiffs regarding § 6009 are controlled by the decision of the Supreme Court in *Pennhurst*. The Court, therefore, interprets the plaintiffs' arguments as being based on 42 U.S.C. §§ 6023 (habilitation plan) and 6042 (advocacy system).

**5.** The statutory provision construed in *Pennhurst I* is presently codified as 42 U.S.C. § 6009. At the time *Pennhurst I* was decided, however, this provision was codified as 42 U.S.C. § 6011. *See supra* note 3.

**6.** The Court distinguishes the present cause of action brought pursuant to the Disabled Assistance Act, from the cause of action brought pursuant to the provisions of the Ohio Rev.Code Ann. § 5123.16. (*See* section IV of this Opinion.) The enabling legislation which gives the ODMMR the authority to dispense funds received under this Act does not include the type of mandatory language contained in Ohio Rev.

For the reasons provided below, the Court denies the defendants' motion to dismiss the claim brought under the Disabled Assistance Act.

The Disabled Assistance Act establishes "a federal-state program whereby the Federal Government provides financial assistance to ... participating States to aid them in creating programs to care for and treat the developmentally disabled." *Pennhurst I*, 451 U.S. at 11, 101 S.Ct. at 1536. Congress, in 42 U.S.C. § 6000(b)(1), states the purpose of the Disabled Assistance Act as being:

> ... to assist States to (A) assure that persons with developmental disabilities receive the care, treatment, and other services necessary to enable them to achieve their maximum potential through increased independence, productivity, and integration into the community, and (B) establish and operate a system which coordinates, monitors, plans, and evaluates services which ensures the protection of the legal and human rights of persons with developmental disabilities.

Additionally, in 42 U.S.C. § 6000(b)(2), Congress states that the "... specific purposes of this chapter are—(A) to assist in the provision of comprehensive services to persons with developmental disabilities, ... [and] (B) to assist States in appropriate planning activities; ...."

The provisions of the Disabled Assistance Act consist of several requirements which the states must meet in order to qualify for the funds available under this Act. *See* 42 U.S.C. § 6008 (affirmative action program for the employment of handicapped persons, a condition of receipt of funds). Other provisions describe the administrative aspects of the Disabled Assistance Act. *See* 42 U.S.C. § 6002 (fiscal percentages provided by the federal government). Additionally, at least one provision

of the Disabled Assistance Act has been held to be nothing more than words of encouragement from Congress, designed merely to "nudge" the states in the preferred direction. *See Pennhurst I*, 451 U.S. at 20, 101 S.Ct. at 1541 (interpreting congressional findings respecting rights of developmentally disabled as mere precatory language).

The specific rights claimed by the plaintiffs under the Disabled Assistance Act are found in 42 U.S.C. §§ 6023 and 6042 which provide as follows:

§ 6023.  Habilitation Plans

\*    \*    \*    \*    \*    \*

The Secretary[7] *shall require* as a condition to a State's receiving an allotment under this subchapter that the State provide the Secretary satisfactory assurances that each program (including programs of any agency, facility, or project) which receives funds from the State's allotment under this subchapter (1) has in effect for each developmentally disabled person who receives services from or under the program a habilitation plan meeting the requirements of subsection (b)

....

§ 6042.  System requirement

\*    \*    \*    \*    \*    \*

In order for a State to receive an allotment under subchapter II of this chapter—

(1) the State *must have* in effect a system to protect and advocate the rights of persons with developmental disabilities; ....

(Emphasis added.)

To state a cause of action under § 1983, a plaintiff must allege that his "rights as secured under federal laws" have been violated by actions "under color of law." *See* 42 U.S.C. § 1983 (1982). The issue before

---

Code Ann. § 5123.16.  *Compare* Ohio Rev.Code Ann. § 5123.35 ("The director of mental retardation and developmental disabilities *may* receive and administer any funds granted to this state under such federal acts.... The department *may* take any action necessary to comply with such federal acts....") *with* Ohio Rev.Code Ann. § 5123.16 ("The department of mental retarda-

tion and developmental disabilities ... *shall* ... be in substantial compliance with standards set forth ... under Title XIX of the 'Social Security Act'....") (emphasis added).

**7.** The term "Secretary" means the Secretary of Health and Human Services.  42 U.S.C. § 6001(14).

this Court is whether the plaintiffs have enforceable rights under §§ 6023 and 6042 of the Disabled Assistance Act.[8]

The defendants argue that the Supreme Court's holding in *Pennhurst I* is controlling in the present action. The Court, however, strongly disagrees. The Supreme Court, in *Pennhurst I*, decided only that the mentally retarded have no rights under § 6009 of the Disabled Assistance Act. *Pennhurst I* expressly declined to reach the issues that are presently before this Court. *Id.*, 451 U.S. at 28, 101 S.Ct. at 1545. Therefore, the Court must decide whether the plaintiffs have stated a cause of action under the Disabled Assistance Act.

In *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court held that a cause of action under 42 U.S.C. § 1983 exists to enforce rights secured by the laws of the United States. *Id.* at 8, 100 S.Ct. at 2506. There are two exceptions to this general rule. First, no cause of action exists where the statute does not create enforceable rights. *See, e.g., Pennhurst I*, 451 U.S. at 18, 101 S.Ct. at 1540. Second, in *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Court found congressional intent to foreclose a private cause of action pursuant to 42 U.S.C. § 1983 through the creation of a separate remedial scheme developed under the Acts in question. *Id.* at 14, 101 S.Ct. at 2623.

The first question which must be addressed, therefore, is whether §§ 6023 and 6042 of the Disabled Assistance Act create enforceable rights for the plaintiffs in this action. The key to determining this issue is legislative intent.[9] *Middlesex*, 453 U.S. at 13, 101 S.Ct. at 2622.

In determining the legislature's intent in enacting the Disabled Assistance Act the Court must first look to whether the plaintiffs are "of the class for whose especial benefit the statute was enacted...." *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). *See also Cannon v. University of Chicago*, 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). The Disabled Assistance Act expressly provides that its "overall purpose" is "to assist States to ... assure that persons with developmental disabilities receive the care, treatment, and other services necessary to enable them to achieve their maximum potential...." 42 U.S.C. § 6000(b)(1). *See also* H.R.Rep. No. 473, 94th Cong., 1st Sess. 42, *reprinted in* 1975 U.S.Code Cong. & Ad.News 919, 961 ("The rights enumerated in the Disabled Assistance Act are generally included ... in recognition ... that the developmentally disabled, particularly those who have the misfortune to require institutionalization have a right to receive appropriate treatment for the conditions for which they are institutionalized...."); S.Rep. No. 493, 98th Cong., 2d Sess. 10, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4334, 4343. ("The ... bill retains as the overall purpose of the program the provision, coordination, planning and monitoring of services for persons with

---

**8.** The Court holds, and the defendants to not contest, that the defendants' alleged action committed pursuant to their statutory authority, are actions "under color of law" for purpose of 42 U.S.C. § 1983.

**9.** Legislative intent is the controlling factor in the interpretation of statutes. *United States v. N.E. Rosenblum Truck Lines, Inc.*, 315 U.S. 50, 53, 62 S.Ct. 445, 447–448, 86 L.Ed. 671 (1942). Despite this well-known fact, legislators frequently fail to express their intent in the statutory language or elsewhere. Such silence is difficult to justify, not only because it forces courts to resort to tedious methods of statutory divination, but also because it risks abortion of the entire statutory agenda if the court is less

than a proficient mindreader. This is such a case. Nowhere in the language of the Disabled Assistance Act did Congress state whether it intended to create rights enforceable by the disabled. A refreshing contrast is Ohio's own version of the Disabled Assistance Act, Ohio Rev. Code Ann. §§ 5123.62, *et seq.* So as to leave no doubt that it intended to create rights which could be enforced through private lawsuits, the Ohio General Assembly expressly provided that, "[a]ny mentally retarded or developmentally disabled person who believes that his or her rights ... have been violated ... may file ... a legal action to enforce [those] rights or to recover damages...." Ohio Rev.Code Ann. § 5123.64(B) (Supp.1986).

developmental disabilities in order to enable such persons to reach their maximum potential.") Thus, it is apparent that if plaintiffs are "persons with developmental disabilities," they are, in the words of *Cort v. Ash,* "of the class for whose special benefit the statute was enacted." *Id.* 422 U.S. at 78, 95 S.Ct. at 2087–2088. The term "developmental disability" is defined in 42 U.S.C. § 6001(7) as follows:

The term "developmental disability" means a severe, chronic disability of a person which—

(A) is attributable to a mental or physical impairment or combination of mental and physical impairments;

(B) is manifested before the person attains age twenty-two;

(C) is likely to continue indefinitely;

(D) results in substantial functional limitations in three or more of the following areas of major life activity: (i) self-care (ii) receptive and expressive language (iii) learning (iv) mobility (v) self-direction (vi) capacity for independent living and (vii) economic self-sufficiency; and

(E) reflects the person's need for a combination and sequence of special interdisciplinary or generic care, treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated.

The defendants do not contest that plaintiffs fit within this definition. The Court therefore finds that plaintiffs are of the class to which Congress intended to bestow benefits in enacting the Disabled Assistance Act.

Before determining, however, that the plaintiffs were given rights under the Disabled Assistance Act, the Court must look to see if the language of the statute is cast in "mandatory terms." *See Pennhurst I,* 451 U.S. at 27, 101 S.Ct. at 1545. *See also Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 433–435, 107 S.Ct. 766, 775–776, 93 L.Ed.2d 781 (1987) (O'Connor, J., dissenting).

In *Pennhurst I,* the Supreme Court described a state's acceptance of funds under the Disabled Assistance Act as being contractual in nature. *See id.,* 451 U.S. at 17,

101 S.Ct. at 1539–1540. ("The legitimacy of Congress' spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'") The contractual nature of the receipt of funds under the Disabled Assistance Act forces the Court to look at whether the provisions of the Act upon which the plaintiffs base their cause of action are specifically enumerated as requirements for the receipt of funds. In other words, if and when the State of Ohio chose to receive funds under the Act, was there sufficient notice of the requirements for the State of Ohio to know "what is expected of it." *Pennhurst I, id.*

The first provision on which the plaintiffs base their claim, 42 U.S.C. § 6042, states in part that a "State *must have* in effect a system to protect and advocate the rights of persons with developmental disabilities." (Emphasis added.) This provision, and the legislative history behind this provision, demonstrate conclusively that if a State accepts funds under the Disabled Assistance Act, it must comply with this provision. *See* S.Rep. 493, 98th Cong., 2d Sess. 28, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4334, 4361. ("The Committee views State Protection and Advocacy systems ... to be of critical importance in an expanding effort by the congress to assure disabled persons both protection of their rights under law and full access to federally funded programs.")

This Court, therefore, finds on the basis of both the plain language of the statute, and the legislative history behind 42 U.S.C. § 6042, that the protection and advocacy system requirement is clearly mandatory upon any state accepting funds under the Disabled Assistance Act. Accordingly, looking at the intent of Congress through the language of the statute and through the legislative history, this Court finds that the plaintiffs do have a right to a protection and advocacy system under 42 U.S.C. § 6042.

The second provision upon which the plaintiffs base their claims is located in 42 U.S.C. § 6023 which states, in part, that the "Secretary shall require as a condition"

of the receipt of federal funds under the Disabled Assistance Act that the state make "satisfactory assurances that each program which receives funds (1) has in effect for each developmentally disabled person who receives services from or under the program a habilitation plan...."

A cursory reading of 42 U.S.C. § 6023 might indicate that an assurance given to the Secretary is not a sufficient indication by Congress to give the plaintiffs a right to an individual habilitation plan. *See, e.g., Pennhurst I,* 451 U.S. at 28, 101 S.Ct. at 1545. ("It is at least an open question whether an individual's interest in having a State provide those 'assurances' is a 'right secured' by the laws of the United States within the meaning of § 1983.") *Cf. id.,* 451 U.S. at 33, 101 S.Ct. at 1548 (Blackmun, J., concurring) ("That private parties, the intended beneficiaries of the Act, should have the power to enforce the modest legal content of [§ 6022] would not be an unusual application of our precedents, even for a legislative scheme that involves federal regulatory supervision of state operations.").

The assurances given to the Secretary with respect to the individual habilitation plans are to be included in the "state plan" which a state must submit to the Secretary prior to the receipt of federal funds. 42 U.S.C. § 6022. *See also* 45 C.F.R. § 1386.30(a) and (d). (§ 1386.30(a): "In order to receive Federal financial assistance under this subpart, ... States must prepare, submit and have in effect a State plan ...; § 1386.30(d): "The State plan must contain assurances that: ... (2) the State meets the requirements regarding individual habilitation plans....")

In addition to the language of the specific statutory provisions, which requires a State to make assurances prior to the receipt of federal funds,[10] the Court notes

that noncompliance by a state with its state plan is cause for the revocation of federal funds.[11] Therefore, it is clear that a State which chooses to accept funds under the Disabled Assistance Act is required to furnish the Secretary assurances that it is providing individual habilitation plans to recipients of the federal funds.

The question of whether a right may be derived from an "assurance" given to the Secretary is also answered in the affirmative by this Court. First, it is a general rule in statutory construction that a court must interpret the language of a statute so as not to "render certain provisions superfluous or insignificant." *Woodfork v. Marine Cooks & Stewards,* 642 F.2d 966, 970–71 (5th Cir.1981) (citing *Zeigler Coal Co. v. Kleppe,* 536 F.2d 398, 406 (D.C.Cir.1976)). *See also South Corp. v. United States,* 690 F.2d 1368, 1374 (Fed.Cir.1982) (a court should not construe a statute in a way which would impute a useless act to Congress). In the present matter, unless the Court construes the creation of the individual habilitation plans as a requirement for the receipt of federal funds under the Disabled Assistance Act, the dictates of Congress would certainly be rendered "superfluous" and "insignificant." The granting of assurances to the Secretary by the State of Ohio in the state plan means absolutely nothing unless those assurances are based in fact. Therefore, the Court holds that the receipt of funds under the Disabled Assistance Act is conditioned upon the state creating individual habilitation plans for those recipients of funds under the Disabled Assistance Act. Accordingly, looking at the intent of the legislature, through the plain language of the statute, and through the regulations as enacted pursuant to the Secretary's authority under

---

10. The state plan, with the proper assurances, must be approved by the Secretary prior to the receipt of federal funds. 45 C.F.R. § 1386.31(b). ("Failure to submit an approvable state plan or amendment prior to the Federal fiscal years for which it is applicable may result in the loss of Federal financial participation. Costs resulting from obligations incurred during the period of the fiscal year for

which an approved plan is not in effect are not eligible for Federal financial participation.")

11. Noncompliance with the state plan can result in the termination of funds under the Disabled Assistance Act. 45 C.F.R. § 1386.30(b). ("Failure to comply with State plan requirements may result in loss of Federal funds....")

the Act,[12] the Court finds that the plaintiffs do have a right to an individual habilitation plan under the Disabled Assistance Act.

However, the findings made by this Court that the plaintiffs have rights under the Disabled Assistance Act do not end the inquiry as to whether the plaintiffs have stated a cause of action under 42 U.S.C. § 1983. The next issue which must be addressed is whether 42 U.S.C. § 1983 can be utilized to enforce these rights.

In determining whether the plaintiffs have an *enforceable* right to the provisions cited in the Disabled Assistance Act, this Court must look to the legislative intent to create such a remedy. *Middlesex*, 453 U.S. at 13, 101 S.Ct. at 2622. This analysis must begin with the general proposition that a court should "not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 423–424, 107 S.Ct. 766, 770–771, 93 L.Ed.2d 781 (1987) (quoting *Smith v. Robinson*, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984)). The burden of showing that there is not a remedy to enforce a "right" under 42 U.S.C. § 1983 is on the state actor. *Wright*, 479 U.S. 418 at 423–424, 107 S.Ct. 766 at 770–771. ("... if there is a state deprivation of a 'right' secured by a federal statute, § 1983 provides a remedial cause of action unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement.")

In the present matter, the Court, upon reviewing the Disabled Assistance Act, does not find any express provision which would preclude a cause of action by the plaintiffs to enforce their legal rights. Therefore, the Court must look to any "specific evidence" which is contained within the statute or legislative history which would indicate a congressional intent to foreclose a 42 U.S.C. § 1983 claim to enforce the provisions of the Disabled Assistance Act.

The issue of how to determine congressional intent to foreclose a private remedy under section 1983 is not a new one for the courts. In *Middlesex*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Court found that by establishing a statutory scheme in which aggrieved persons could enforce their rights under the Water Pollution Act, 33 U.S.C. §§ 1251, *et seq.*, and the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. §§ 1401, *et seq.*, Congress had foreclosed a separate cause of action under 42 U.S.C. § 1983.[13] *Middlesex*, 453 U.S. at 14, 101 S.Ct. at 2623.

More recently, in *Wright*, 479 U.S. 418 at 423–424, 107 S.Ct. 766 at 770–771, the issue decided was whether low-income housing tenants had a private cause of action to enforce the rental provisions of the Brooke Amendment to the Housing Act of 1937, 42 U.S.C. § 1437a ("Brooke Amendment"), and the regulations of the Department of Housing and Urban Development ("HUD"). After finding that the plaintiffs had a "right" under the provisions of the Brooke Amendment,[14] the Court analyzed whether Congress had intended that the provisions of the Act be enforceable only by HUD, as held by the lower court. *See Wright v. City of Roanoke Redevelopment & Housing Authority*, 771 F.2d 833, 837 (4th Cir. 1985) ("HUD alone may, as quasi trustee,

---

12. *See Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 426–427, 107 S.Ct. 766, 772–773, 93 L.Ed.2d 781 (1987) (using Housing and Urban Development regulations to determine whether plaintiffs had private cause of action under the Brooke Amendment to the Housing Act of 1937, 42 U.S.C. § 1437(a)).

13. The plaintiffs, in *Middlesex*, had failed to comply with a specific requirement contained in the separate citizen suit provisions. Therefore, being precluded from bringing the suit

under the statutory scheme established by Congress, the plaintiffs attempted to bring suit under 42 U.S.C. § 1983. *Middlesex*, 453 U.S. at 14, 101 S.Ct. at 2623.

14. The specific allegation of the plaintiffs in *Wright* was that the defendants "imposed a surcharge for 'excess' utility consumption that should have been part of [the plaintiffs'] rent and deprived them of their statutory right to pay only the prescribed maximum portion of their income as rent." *Wright*, 479 U.S. 418 at 423–424, 107 S.Ct. 766 at 770–771.

take legal action, for the right is explicitly tailored not to allow the beneficiaries, the low cost housing tenants, to do so").

The Supreme Court of the United States found that the defendant had failed to "overcome its burden of showing that 'the remedial devices provided in [the Housing Act] are sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.'" *Wright,* 479 U.S. 418 at 423–424, 107 S.Ct. 766 at 770–771. The Court, in reaching this determination, looked at both the negative and the positive aspects of congressional intent. The Court found that the Brooke Amendment and its legislative history was "devoid of any express indication that exclusive enforcement authority was vested in HUD...." *Id.* Additionally, the Court found that there was a positive representation in both congressional and HUD actions indicating that enforcement authority was not centralized, and that a private right of action was anticipated by Congress.

The Supreme Court, in analyzing the remedial scheme provided under the Housing Act and the Brooke Amendment, noted that HUD officials had represented to Congress during hearings that tenants had the right to enforce the Brooke Amendment in federal court and that a formal grievance procedure for the resolution of tenant disputes had been created by HUD. *Id.* at 426–427, 107 S.Ct. at 772–773. Additionally, the Court found pertinent the fact that the only private remedy provided for in the Housing Act itself was a local grievance procedure. *Id.* at 426–432, 107 S.Ct. at 772–775.

The Court rejected the Court of Appeals' contention that "HUD's authority to audit, enforce annual contributions contracts, and cut off federal funds" was sufficient to indicate that there was congressional intention to foreclose remedies under 42 U.S.C. § 1983. *Id.* at 426–427, 107 S.Ct. at 772–773. The Court found that HUD's audits every eight years of the many Public Housing Authorities was insufficient to demonstrate exclusive enforcement authority being vested in HUD. *Id.* Additionally, the

Court noted that the HUD regulations did not provide any formal mechanism for tenants to bring violations of the regulations to the attention of the HUD officials. *Id.*

The Supreme Court, after looking at all of the evidence, concluded that there was no specific evidence that Congress intended to foreclose a private cause of action under 42 U.S.C. § 1983. *Wright,* 479 U.S. 418 at 430–432, 107 S.Ct. 766 at 774–775.

In the present matter, this Court, following a review of all of the procedures for enforcement of the provisions of the Disabled Assistance Act created by Congress and the Secretary, and viewing them in light of the presumption that rights created under federal statutes are enforceable under 42 U.S.C. § 1983, holds that the plaintiffs may bring their cause of action under the Disabled Assistance Act, pursuant to 42 U.S.C. § 1983.

First, although the only enforcement provision explicitly provided for in the Disabled Assistance Act is action by the Secretary, *see* 42 U.S.C. § 6022(c) (Secretary may disapprove State plan following reasonable notice and opportunity for a hearing), this is not dispositive of the issue of enforceability by private citizens. *Wright,* 479 U.S. 418 at 423–424, 107 S.Ct. 766 at 770–771.

Furthermore, a review of the other indicia of congressional intent does not overcome the presumption in favor of the creation of an enforceable right under 42 U.S.C. § 1983. Indeed, the regulations affirmatively permit "injured parties" to become parties in a state plan revocation hearing, 45 C.F.R. § 386.94(b)(1). Upon the Secretary's disapproval of a state plan or amendments to a state plan, there are precise procedures which must be followed by the Secretary. *See* 45 C.F.R. §§ 1386.-80–1386.112. A hearing must be held to provide the state a forum to defend its state plan. 45 C.F.R. § 1386.81. At this hearing, other parties may be allowed to participate. Thus, 45 C.F.R. § 1386.94(b)(1) provides that "[o]ther individuals or groups may be recognized as parties if the issues to be considered at the hearing have caused them injury and their interests are relevant

to the issues in the hearing." The Court notes that the regulations do not simply give the developmentally disabled the right to be heard or to participate in the hearings, but to actually be "recognized as parties."

Additionally, as in *Wright*, the procedures established by the Secretary to review the state plan and the advocacy system, are not sufficient to comprehensively guarantee state compliance. Thus, pursuant to 45 C.F.R. § 1386.30(d) "[t]he State plan must be reviewed [by the Secretary] at least once every three years," but need not be reviewed by the Secretary more often than once every three years. Additionally, as in *Wright*, there is no mechanism by which injured parties can bring violations to the attention of the Secretary. Therefore, unless the beneficiaries of the plan are afforded a private right of action to enforce it, a state could, conceivably, violate its own plan with impunity for three years.

With one possible exception the legislative history of the Disabled Assistance Act appears to be devoid of any congressional statements either for or against the creation of a private cause of action. That one exception is the following statement made in discussing the bill of rights provisions of the Act, 42 U.S.C. § 6009:

> These rights are generally included ... in recognition ... that the developmentally disabled, particularly those who have the misfortune to require institutionalization have a right to receive appropriate treatment for the conditions for which they are institutionalized and that this right should be protected and *assured by the Congress and the courts.* (Emphasis added.)

H.R.Rep. No. 473, 94th Cong., 1st Sess. 42, *reprinted in* 1975 U.S.Code Cong. & Ad. News 919, 961. Any contention that Congress intended to preclude reliance upon the courts to enforce the state plan and advocacy system is refuted by this statement in the legislative history of the Act.

The defendants, in their motion to dismiss, argue that the state of Ohio has the option of choosing to receive federal funds under the Disabled Assistance Act, and thus the plaintiffs do not have the right to bring this action if the state chooses not to meet the requirements of the Act. However, as was stated previously in *Wright*, 479 U.S. 418 at 423–424, 107 S.Ct. 766 at 770–771, the ability of the Secretary to cut off funds does not preclude a private cause of action under 42 U.S.C. § 1983.

Presently, this Court does not have sufficient information to determine whether the State of Ohio is presently receiving funds under the Disabled Assistance Act; and if the State is receiving funds, to which programs these funds are alloted. Although this defect in the pleadings and motions is not to be ignored by a court, neither should such a technical defect be the basis for a decision on the merits. *See Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962). ("It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities.")

Additionally, the defendants argue that the plaintiffs, even if they do have a right to bring this cause of action, have not requested a proper remedy. The plaintiffs have requested that this Court declare the State of Ohio in violation of the Disabled Assistance Act, and to grant an injunction ordering the state to meet the requirements as provided under the Disabled Assistance Act. However, this argument is not appropriate for a motion to dismiss. The inclusion in a complaint of an improper remedy does not require the dismissal of a meritorious claim. *See Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 65, 99 S.Ct. 383, 387, 58 L.Ed.2d 292 (1978).

Looking at the statutory language, the legislative history, and applying settled principles of statutory interpretation, the Court finds that the defendants have failed to overcome the "burden of showing that 'the remedial devices provided in [the Disabled Assistance Act] are sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Wright*, 479 U.S. at 423–

424, 107 S.Ct. at 770–771, 93 L.Ed.2d at 789 (1987).

For the foregoing reasons the Court concludes that the plaintiffs' complaint states a claim for relief under the Disabled Assistance Act.

## II.

■ Plaintiffs' second theory for relief is predicated upon the Medicaid provisions of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* The gist of plaintiffs' claim appears to be that by allowing CDC to lose its certification as a Medicaid certified facility, defendants have deprived plaintiffs of various rights under 42 U.S.C. §§ 1396, *et seq.* Plaintiffs contend that the rights which accrue to them under § 1396 and its implementing regulations are (a) the right to receive "active treatment," 42 U.S.C. § 1396d(d) and 42 C.F.R. § 435.1009; (b) the right to choose to be placed in an appropriate Medicaid facility, 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. § 431.51; and (c) the right to notice and a hearing prior to termination of their Medicaid services, 42 U.S.C. § 1396a(a)(3) and 42 C.F.R. §§ 431.-200, *et seq.*

Virtually indistinguishable claims were rejected by the Supreme Court in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), in which the Supreme Court held that 42 U.S.C. § 1396 does not create substantive rights in favor of Medicaid recipients. *Id.* at 786, 100 S.Ct. at 2475. O'Bannon teaches that:

> Whether viewed singly or in combination, the Medicaid provisions relied upon by the Court of Appeals do not confer a right to continued residence in the home of one's choice. Title 42 U.S.C. § 1396a(a)(23) (1976 ed. Supp. II) gives recipients the right to choose among a range of *qualified* providers, without government interference. By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified. But it clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified. Second, although the regulations do protect patients by limiting the circumstances under which a *home* may transfer or discharge a Medicaid recipient, they do not purport to limit the Government's right to make a transfer necessary by decertifying a facility. Finally, since decertification does not reduce or terminate a patient's financial assistance, but merely requires him to use it for care at a different facility, regulations granting recipients the right to a hearing prior to a reduction in financial benefits are irrelevant.

*Id.* at 785–86, 100 S.Ct. at 2475–76 (emphasis in original). In light of the foregoing, this Court is constrained to conclude that § 1396 does not, by itself, create rights which may be sued upon by plaintiffs as Medicaid recipients and, hence, plaintiffs' complaint fails to state a claim for relief under ·42 U.S.C. §§ 1396, *et seq.*

In reaching this conclusion, this Court has not overlooked plaintiffs' attempt to distinguish this case from *O'Bannon.* In essence, plaintiffs argue that, in *O'Bannon,* the Medicaid recipients claimed that they were entitled to an evidentiary hearing on the merits of the decertification decision before certification was revoked. The instant plaintiffs contend that their claim in this case is different, in that they are not seeking to sue the federal or state agencies who decertified CDC. Rather, plaintiffs argue, this is a suit against the state officials in charge of the Ohio Department of Mental Retardation and Developmental Disabilities who allegedly allowed CDC to become decertified. The Court finds this to be a distinction without merit.

*O'Bannon* clearly stands for the proposition that 42 U.S.C. § 1396 does not create substantive rights which may be enforced by Medicaid recipients. Although *O'Bannon* did state in dictum that the Medicaid-eligible nursing home residents who lost their Medicaid benefits as a result of the nursing home's failure to maintain its Medicaid certification "might have a claim

against the nursing home for damages," *id.* at 787, 100 S.Ct. at 2476, the Court hastened to point out that "[t]his would, of course, depend on the contract between the patients and the nursing home, if any, and the provisions of the applicable law." *Id.,* at 787 n. 20, 100 S.Ct. at 2476 n. 20. Thus, to the extent that Medicaid recipients do have a cause of action against the provider of Medicaid services for its failure to maintain Medicaid certification, that cause of action arises by way of contract or state law, not under the federal statute, 42 U.S.C. § 1396. In this case, plaintiffs have alluded to no contract between themselves and defendants whose terms were breached. They only cite the federal statutory provisions of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* Under *O'Bannon,* a claim predicated upon 42 U.S.C. § 1396 *simpliciter* will not lie.

### III.

For their third claim, plaintiffs allege that defendants have:

> allowed plaintiffs and all other residents of CDC to live in ... [a] hazardous and dangerous [environment] ... characterized by a significant number of injuries and circumstances which compromise client safety, and further characterized as an environment where residents' freedom of movement is restricted due to lack of training for staff and residents....

Plaintiffs contend that these circumstances violate their liberty interests under the due process clause of the fourteenth amendment.

In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that an involuntarily committed retarded person has constitutionally protected liberty interests, under the due process clause of the fourteenth amendment, to reasonably safe conditions of confinement, freedom from unreasonable bodily restraint, and such minimally adequate training as reasonably may be required by these interests. *Id.* at 319, 324, 102 S.Ct. at 2459, 2462. These interests, however, are not absolute. *Id.* at 319–20, 102 S.Ct. at 2459–60. To the contrary, the Court specifically noted that:

> In operating an institution [for the mentally retarded] there are occasions in which it is necessary for the State to restrain the movement of residents—for example, to protect them as well as others from violence. Similar restraints may also be appropriate in a training program. And an institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement. The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process.

*Id.* at 320, 102 S.Ct. at 2460. (Footnote omitted.)

In making this determination, the Court must balance "the individual's liberty interest against the State's asserted reasons for restraining individual liberty." *Id.* at 320, 102 S.Ct. at 2460. Moreover, *Youngberg* admonishes that "this balancing cannot be left to the unguided discretion of a judge or jury." *Id.* at 321, 102 S.Ct. at 2461. Thus, a judge called upon to decide whether a particular curtailment of liberty is reasonable or unreasonable under the circumstances "must show deference to the judgment exercised by a qualified professional" who prescribed the restraint. *Id.* at 322, 102 S.Ct. at 2461. The Court, in *Youngberg,* concluded that:

> the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of freedom and from unreasonable restraints "... only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."

*Id.* at 321, 102 S.Ct. at 2461 (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3d Cir.1980) (Seitz, J., concurring)).

The instant defendants, in their motion to dismiss, contend that plaintiffs have

failed to allege conduct establishing a violation of their substantive due process rights. The Court does not agree. To the contrary, plaintiffs' complaint alleges several specific occurrences which, if true, would indicate a total lack of judgment, professional or otherwise, on the part of defendants. For example, the complaint alleges that plaintiff Phillip Nicoletti, a 46–year–old retarded adult, was permitted to stray from the institution's grounds and wander the public streets without staff members of the CDC being aware of his absence; that plaintiff Frank Koniecdynski, a 65–year–old male resident was allowed to fall through a third-floor window in one of the residential cottages at CDC and has also been permitted to wander unnoticed from the institution's grounds; and that plaintiff Donna Marie Horvath, a 51–year–old female, sustained a broken hip while residing at CDC. Additionally, plaintiffs' complaint quotes extensively from various studies that have been made of the conditions at CDC and other developmental centers in Cuyahoga County by experts in the field such as the National Assault Prevention Center and the University of North Carolina School of Medicine. These studies, which were commissioned by defendants themselves, variously characterize the conditions at CDC as "dangerous" and "hazardous" due to a "significant amount of injuries and circumstances ... which compromise the safety of residents." Construed, as they must be, in the light most favorable to the plaintiffs, *Kugler v. Helfant*, 421 U.S. 117, 125–26, 95 S.Ct. 1524, 1531, 44 L.Ed.2d 15 (1975), these allegations indicate that there has been a total failure on the part of defendants to exercise professional judgment where plaintiffs are concerned. The Court concludes, therefore, that plaintiffs' complaint states a claim for relief under the standards articulated in *Youngberg*.

### IV.

Plaintiffs' final argument is that the complaint states a claim under § 5123.16 of the Ohio Revised Code and the due process clause of the fourteenth amendment. Section 5123.16 requires institutions under the control of the Department of Mental Retardation and Developmental Disabilities to be in substantial compliance with the standards set forth under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* Plaintiffs argue that § 5123.16 creates a property interest which triggers due process protections, and that defendants' actions in permitting the Cleveland Developmental Center (CDC) to become decertified as a Medicaid ICF/MR facility deprived them of this property interest without due process.

In order to state a claim for relief under the due process clause, plaintiffs' complaint must allege "both governmental action and the deprivation of a 'life, liberty, or property' interest...." *Banks v. Block*, 700 F.2d 292, 295 (6th Cir.1983). There can be no dispute that plaintiffs' complaint satisfies the governmental action requirement. The complaint alleges that plaintiffs have been deprived of various benefits by state officials acting under color of law. This is a sufficient allegation of governmental action. *Id.* at 295. The critical question, therefore, is whether the benefits referred to by plaintiffs constitute a liberty or property interest.

In searching for the answer to this question, the Supreme Court's decision in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), is perhaps the most didactic. *Roth* teaches that there is no precise definition of "liberty" or "property" because these terms "are among the [g]reat [constitutional] concepts ... purposefully left to gather meaning from experience." *Id.* at 571, 92 S.Ct. at 2705–2706. *See also, Banks v. Block*, 700 F.2d at 295–96. Both concepts have been broadly defined over the course of the Supreme Court's decisions. For example, in *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), liberty was defined to include:

not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God

according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men.

This list is far from exhaustive and, in more recent times, a variety of statutorily created rights have been held to be protected liberty interests. *See, e.g., Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (state statute establishing a parole system creates a protected liberty interest); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (liberty interest created by statute awarding prisoners time off from their sentences for good behavior).

■ Property has also been defined broadly. For due process purposes, property encompasses interests that "extend well beyond actual ownership of real estate, chattels, or money," *Roth,* 408 U.S. at 572, 92 S.Ct. at 2706, and paralleling the expansion of "liberty," has been held to include a number of intangible, statutorily created "entitlements." *See Duchesne v. Williams,* No. 86–1017, slip op. at 11 (6th Cir. June 16, 1987). As stated in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972):

"property" interests subject to procedural due process are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings." ... A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit under-

standings that support his claim of entitlement to the benefit....

*Id.* at 601, 92 S.Ct. at 2699.

■ Yet, despite the rather broad, outer contours that have been ascribed to both liberty and property, "the range of [these] interests ... is not infinite." *Roth,* 408 U.S. at 570, 92 S.Ct. at 2705. In order to establish that a claimed interest is a property interest meriting due process protection, an individual must demonstrate that two interrelated criteria are met. First, he must show that the claimed interest stems from an *independent source of law,* such as a "statute or legal rule or ... mutually explicit understanding." *Leis v. Flynt,* 439 U.S. 438, 442, 99 S.Ct. 698, 700–01, 58 L.Ed.2d 717 (1979). As explained by *Roth:*

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* 408 U.S. at 577, 92 S.Ct. at 2709. Second, he must show that the independent source of law bestows upon him a "legitimate claim of entitlement." In the words of *Roth,* "[t]o have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. at 2709. Illustrative cases applying these principles to find that a particular statutory scheme created a property interest [15] or a liberty interest [16] under the due process clause are collected in the margin.

---

15. *See, e.g., Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (Illinois Fair Employment Practices Act creates property interest in right of access to state's adjudicatory machinery); *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (state statutory scheme creates property interest in horse trainer's license); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (statutory entitlement to Social Security benefits); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (Ohio statutory scheme creates property interest in public education); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29

L.Ed.2d 90 (1971) (state statutory scheme creates property interest in driver's license); *Goldberg v. Kelley,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (seminal case; state/federal statutory schemes create property interest in welfare benefits).

16. *See, e.g., Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (Montana parole statute creates liberty interest in parole once statutory criteria are met); *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (Pennsylvania's administrative segregation statutes and regulations create liberty

■ The plaintiffs in this case contend that Ohio Rev.Code Ann. § 5123.16 (Supp. 1986) creates a property interest. Section 5123.16 provides, in pertinent part, that:

The department of mental retardation and developmental disabilities and any institutions under its supervision or jurisdiction shall, where applicable, by July 1, 1982, be in substantial compliance with standards set forth for mental retardation facilities by the accreditation council for services for mentally retarded and other developmentally disabled persons or medical assistance standards under Title XIX of the "Social Security Act," as amended, except that the department and any institution under its supervision or jurisdiction shall be in substantial compliance with standards for physical facilities and equipment by January 1, 1983.

There can be no question that plaintiffs have satisfied the first *Roth* requirement. This is not a case in which plaintiffs have merely alleged a denial of due process *simpliciter. Cf. Wilson v. Beebe,* 770 F.2d 578, 585 (6th Cir.1985) (*en banc*). To the contrary, plaintiffs have identified a state statute as the source of the interest they are claiming. This satisfies *Roth's* requirement that the putative property interest stem from "an independent source such as state law." *Id.* 408 U.S. at 577, 92 S.Ct. at 2709. The inquiry, therefore, must focus on whether the statute in question bestows upon plaintiffs a legitimate claim of entitlement.

The defendants argue vigorously that it does not. They argue that while § 5123.16 "expresses the Legislature's intent to have all developmental centers operated in substantial compliance with the Medicaid provisions, it nowhere guarantees a mentally retarded resident an entitlement to be placed in such a facility." They further argue that § 5123.16 fails to specify "what

happens if the center fails to be in substantial compliance" with the Medicaid provisions.

Defendants' argument does have some superficial appeal. There can be no dispute that § 5123.16 imposes a peremptory, non-discretionary duty upon the Department of Mental Retardation and Developmental Disabilities to maintain its institutions in accordance with Title XIX standards. However, the statute fails to state who is empowered to enforce its provisions if ODMRDD fails in the performance of this duty, or what the remedy for non-performance is. Thus, it could be argued that because § 5123.16 does not expressly state that an institutionalized mentally retarded person has the right to enforce § 5123.16's commands, the only person who may do so is the governor of the state, and that his sole remedy is to dismiss the derelict officials and appoint new ones.

However, in attempting to divine the Ohio General Assembly's intent in enacting § 5123.16, this Court must not narrowly focus upon the language of § 5123.16 alone. As stated in *Pennhurst State School v. Halderman,* 451 U.S. 1, 18, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981), "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Id.* at 18, 101 S.Ct. at 2625 (quoting *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975)). Thus, § 5123.16 must be "read in the context of other more specific provisions of the Act" of which it is a part. *Pennhurst,* 451 U.S. at 19, 101 S.Ct. at 2625.

The provisions presently codified as § 5123.16 of the Ohio Revised Code are merely a fractional part of a more extensive enactment, Am.Sub. House Bill 900,

interest in remaining in general prison population); *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (Nebraska statute creates liberty interest in not being transferred to mental hospital absent finding of mental illness); *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (Nebraska parole statute creates liberty interest in parole release); *Enmoto v. Wright,* 434 U.S.

1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978), summarily affirming *Wright v. Enmoto,* 462 F.Supp. 397 (N.D.Cal.1976) (prison regulation creates liberty interest in freedom from maximum security confinement unless regulation's requirements are met); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (state statute creates liberty interest in prison good time credits).

passed by the Ohio General Assembly in 1980. *See Baldwin's Ohio Legislative Service* (1980) at 5–242. Among other things, the act abolished the Ohio Department of Mental Health and Mental Retardation, and transferred its functions to two newly created departments, the Department of Mental Health, and the Department of Mental Retardation and Developmental Disabilities. See Am.Sub. House Bill 900, § 4, *Baldwin's Ohio Legislative Service* (1980) at 5–318. The provisions of Am.Sub. House Bill 900 dealing with the care and treatment of the mentally retarded and developmentally disabled were codified as chapter 5123 of the Ohio Revised Code. Amendments to chapter 5123 were subsequently made, and new provisions were added, in 1981, 1983 and 1986.

As amended, chapter 5123 provides in comprehensive fashion for the care and treatment of the mentally retarded and developmentally disabled. *Inter alia*, it establishes the Department of Mental Retardation and Developmental Disabilities and defines the Department's powers and duties (§ 5123.02); provides that the Department shall maintain, operate, manage and govern all state institutions for the care, treatment and training of the mentally retarded (§ 5123.03); provides that the Department and institutions under its jurisdiction shall be in substantial compliance with the standards of Title XIX of the Social Security Act (§ 5123.16); and designates the Department as "the sole agency to establish and administer the statewide plans required as a condition of receiving federal assistance under the 'Developmental Disabilities Services and Construction Act,' ... 42 U.S.C. § 6001, as amended." (§ 5123.35).

Additionally, chapter 5123 creates a Legal Rights Service charged with the duty of protecting and advocating the rights of mentally ill and developmentally disabled persons (§ 5123.60). *Inter alia*, the Legal Rights Service is empowered to receive and act upon complaints concerning conditions of institutions for the mentally retarded (§ 5123.60(A)), and to "initiate actions in mandamus and such other legal and equitable remedies as may be necessary to accomplish the purposes of" chapter 5123 (§ 5123.60(G)).

Finally, pursuant to the provisions added in 1986, chapter 5123 establishes a "Bill of Rights" for mentally retarded and developmentally disabled persons (§ 5123.62). *Inter alia*, the Bill of Rights provides that the mentally retarded have "[t]he right to an appropriate, safe, and sanitary living environment that complies with local, state and federal standards (§ 5123.60(B)); the "right of access to necessary ancillary services including, but not limited to, occupational therapy, physical therapy, speech therapy, and behavior modification and other psychological services (§ 5123.60(F)); and the "right to receive appropriate care and treatment in the least intrusive manner (§ 5123.60(G)). If any of these rights are abridged, § 5123.64 specifically provides that the affected mentally retarded person may sue for enforcement. Section 5123.-64(B) provides, in pertinent part, that:

> Any mentally retarded or developmentally disabled person who believes that his or her rights as enumerated in Section 5123.62 of the Revised Code have been violated may ... [t]ake any ... appropriate action to ensure compliance with sections 5123.60 to 5123.64 of the Revised Code, *including the filing of a legal action to enforce rights or to recover damages for violation of rights.*

(Emphasis added.) To the extent that there is any doubt as to how these provisions are to be construed, or who the intended beneficiaries are, such doubt is totally dispelled by § 5123.34 which provides, *inter alia*, that "[t]his chapter [5123] attempts ... [t]o provide humane and scientific treatment and care and the highest attainable degree of individual development *for mentally retarded persons admitted to state institutions.*" Ohio Rev.Code Ann. § 5123.34(A) (1981) (emphasis added).

This Court is of the opinion that when these provisions are construed *in pari materia*, as they must be,[17] it becomes

---

**17.** Statutes which are parts of the same general scheme or plan, or relate to the same subject,

clear that mentally retarded persons admitted to state institutions have a legitimate claim of entitlement to be cared for in an institution that meets the standards of Title XIX of the Social Security Act. Section 5123.16 of the Revised Code imposes a peremptory, non-discretionary duty upon ODMRDD to maintain all state institutions in accordance with those standards. Section 5123.34(A) indicates that the mentally retarded are the intended beneficiaries of the duties imposed by § 5123.16, and in addition thereto, § 5123.60(B) expressly guarantees that the mentally retarded have the right to "an appropriate, safe, and sanitary living environment that complies with local, state, and federal standards." Finally, §§ 5123.60(G) and 5123.64(B) specifically provide that mentally retarded persons may sue to enforce these rights. Indeed, the statutory scheme involved here presents a far more compelling case for finding a "legitimate claim of entitlement" than those analyzed in any of the reported decisions found by this Court.[18]

This, however, does not end the inquiry. Having found that Ohio's statutory scheme creates a legitimate claim of entitlement meriting due process protection, it is now necessary to determine what process is due. In most cases, litigants seek some kind of procedural protections, arguing that they are entitled to some form of notice and hearing before the state can take away the property interest involved. The instant plaintiffs, however, make no such claim in this case. Rather, they seek a mandatory injunction directing the defendants to bring CDC back into compliance with Title XIX requirements. In essence, they argue that § 5123.16 creates substantive rights which cannot be taken from them no matter what procedural protections are afforded. *See Hudson v. Palmer*, 468 U.S. 517, 541 n. 4, 104 S.Ct. 3194, 3207–3208 n. 4, 82 L.Ed.2d 393 (1984) (separate opinion of Stevens, J.); *Wilson v. Beebe*, 770 F.2d at 586.

■ The due process clause of the fourteenth amendment is comprised of both procedural and substantive components. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 677–78, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring); *Harrah Independent School District v. Martin*, 440 U.S. 194, 197–99, 99 S.Ct. 1062, 1063–64, 59 L.Ed.2d 248 (1979). Procedural due process accords an individual the right to a fair hearing before being deprived of a liberty or property interest. *See, e.g., Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975–76, 41 L.Ed.2d 935 (1974). Substantive due process, on the other hand, protects the individual from being deprived of liberty or property except for legally recognized, legally justified reasons.

The distinction between substantive and procedural due process can be illustrated by an examination of *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). In that case, a security guard for the Cleveland, Ohio, Board of Education (a "classified civil servant") was fired when it was discovered that he failed to disclose on his job application the fact that he had been previously convicted of a felony. Ohio's statutes provided that classified civil servants were entitled to hold their jobs " 'during good behavior and efficient service,' " and could not be discharged " 'except ... for ... misfeasance, malfeasance, or nonfeasance in office ...' " 470 U.S. at

---

are *in pari materia* and should be construed together. *Stafford v. Biggs*, 444 U.S. 527, 535, 100 S.Ct. 774, 780, 63 L.Ed.2d 1 (1980); *Erlenbaugh v. United States*, 409 U.S. 239, 243–44, 93 S.Ct. 477, 480–81, 34 L.Ed.2d 446 (1972); *Estate of Sanford v. Commissioner*, 308 U.S. 39, 44, 60 S.Ct. 51, 56, 84 L.Ed. 20 (1939).

**18.** See cases collected *supra* nn. 3, 4. In each of those cases, the statute accorded state officials at least some, if not broad, discretion. Here, by contrast, the statute is cast in mandatory, non-discretionary terms. So long as the statute places "substantive limitations" upon official discretion, "an expectation or entitlement has been created which cannot be taken away without ... due process...." *Franklin v. Aycock*, 795 F.2d 1253, 1260 (6th Cir.1986) (quoting from *Bills v. Henderson*, 631 F.2d 1287, 1293 (6th Cir.1980)). *A fortiori*, a protected property interest has been created where, as here, the state "has used language of an unmistakably mandatory character." *Hewitt v. Helms*, 459 U.S. at 471, 103 S.Ct. at 871.

538–39, 105 S.Ct. at 1491 (quoting Ohio Rev.Code Ann. §§ 124.11, 124.34 (1984)). The Court found that these statutes created a substantive right which could not be taken away without due process. 470 U.S. at 540–41, 105 S.Ct. at 1492–93. The Court went on to hold that the *procedural* component of the due process clause was violated because the employee had been fired without being afforded "a pretermination opportunity to respond" to the charge against him. 470 U.S. at 548, 105 S.Ct. at 1492. By way of contrast, the substantive component of the due process clause would have been violated if the employee had been fired for reasons other than "misfeasance, malfeasance, or nonfeasance in office," because these were the only legally recognized, legally justified reasons for discharge under the statutes creating the substantive right. Thus, if the employee had been fired, for instance, because of a personal dispute with his supervisor that was unrelated to his job, his discharge would have violated substantive due process. *See Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir.1982) (discharge of public employee on pretextual grounds, unrelated to proper reasons for layoff, violates substantive due process). Several recent decisions have stressed the fact that substantive due process can be violated even when all procedural requirements have been scrupulously observed. *See, e.g., Daniels v. Williams*, 106 S.Ct. at 665; *Hudson v. Palmer*, 468 U.S. 517, 541 n. 4, 104 S.Ct. 3194, 3207–08 n. 4, 82 L.Ed.2d 393 (1984) (separate opinion of Stevens, J.); *Franklin v. Aycock*, 795 F.2d 1253, 1259 (6th Cir.1986). For example, in *Nishiyama v. Dickson County, Tennessee*, 814 F.2d 277 (6th Cir.1987), the Sixth Circuit stated:

In *Wilson v. Beebe*, 770 F.2d 578, 583 (6th Cir.1985), this Court recognized that section 1983 provides a remedy for both procedural and substantive due process violations, and the Supreme Court made clear in *Daniels v. Williams* ... that *there are certain types of government acts that violate the Due Process Clause regardless of the procedures used to implement them.* When the government engages in such conduct, there is a remedy under section 1983.

*Id.* at 281, emphasis added.

■■■ Numerous cases state, as a general proposition, that for a plaintiff to establish a substantive due process violation, he must prove that the state or its agent acted *arbitrarily*.[19] An analysis of these cases discloses that, in each instance, the act complained of was a discretionary act, and the actor (state official) was vested with some degree of discretion. Obviously, a state official does not violate any individual's rights so long as he acts within the scope of his discretion. In order to violate substantive due process, there must be an abuse of official power. *Daniels v. Williams*, 106 S.Ct. at 664–65; *Parratt v. Taylor*, 451 U.S. 527, 549, 101 S.Ct. 1908, 1919, 68 L.Ed.2d 420 (1981) (Stewart, J., concurring). Thus, it is only when an official exceeds his discretion or abuses it that substantive due process is violated.

For this reason, this Court perceives the requirement of "arbitrariness" to be tantamount to a requirement that a state official vested with discretion do something to clearly exceed or abuse that discretion. Since state officials almost always have some, if not broad, discretion, the vast majority of cases reviewing state action on substantive due process grounds have involved the review of discretionary acts. Hence, the reported decisions have routinely required a showing of arbitrary action to establish a substantive due process violation.

This case, therefore, presents a somewhat unique situation because the instant defendants have no discretion. To the con-

---

19. *See, e.g., Daniels v. Williams*, 106 S.Ct. at 665; *Harrah Independent School District v. Martin*, 440 U.S. at 198–99, 99 S.Ct. at 1064–65; *Barnett v. Housing Authority of City of Atlanta*, 707 F.2d 1571, 1577 (11th Cir.1983); *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir.1983); *Joslyn v. Kinch*, 613 F.Supp. 1168, 1179 (D.R.I.

1985); *Crook v. Baker*, 584 F.Supp. 1531, 1562 (E.D.Mich.1984); *Salerno v. O'Rourke*, 555 F.Supp. 750, 761–62 (D.N.J.1983); *Kaufman v. Board of Trustees*, 552 F.Supp. 1143, 1153 (N.D. Ill.1982); *Whitaker v. Board of Higher Ed. of City of New York*, 461 F.Supp. 99, 103–04 (E.D. N.Y.1978).

trary, Ohio Rev.Code Ann. § 5123.16 imposes a mandatory duty upon DMRDD to maintain the institutions under its control in compliance with Title XIX standards. This statutory duty is peremptory in nature and admits of no discretion. Since arbitrariness is an element of a substantive due process claim only when the action complained of is action committed to the discretion of state officials, and since the defendants here have no discretion, the requirement of pleading and proving arbitrariness is inapplicable. Accordingly, this Court holds that to establish a violation of substantive due process under the circumstances of this case, plaintiffs need only plead and prove that defendants failed to perform their statutory, mandatory duty under § 5123.16, and that this failure harmed the plaintiffs.

In the alternative, this Court holds that where, as here, a state official fails to perform a mandatory, nondiscretionary statutory duty, such failure is *ipso facto* arbitrary. The Court arrives at this conclusion by two separate routes. First, action has traditionally been deemed arbitrary if it is not rationally related to a legitimate governmental purpose, *Nebbia v. New York*, 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940 (1934); lacks reasonable justification, *Canty v. Board of Education*, 312 F.Supp. 254, 256 (S.D.N.Y.1970); or "is taken without any authority of law or upon a misconstruction of the statutory authority under which it purports to be taken...." *Antilles Industries, Inc. v. Virgin Islands*, 388 F.Supp. 315, 322 (D.V.I.1974) (quoting *In re Hooper's Estate*, 359 F.2d 569, 575 n. 7 (3d Cir.1966)). The statute under which action is purportedly taken is the starting point for determining whether the action has a reasonable justification or legitimate governmental purpose. For example, in *Cleveland Board of Education v. Loudermill*, the statutory scheme created a property interest in employment which could be taken away only for "misfeasance, malfeasance, or nonfeasance in office." 470 U.S. at 538–39, 105 S.Ct. at 1491–92. Thus, under the statute, the only reasonable justification or legitimate governmental purpose for state action terminating employ-

ment was "misfeasance, malfeasance, or nonfeasance in office." Termination of employment for any other reason, *e.g.*, for personal animosity between the employee and his supervisor, would be outside the scope of legitimate governmental purpose and, hence, would be arbitrary. *Hearn v. City of Gainesville*, 688 F.2d at 1332–33.

Unlike the statutory scheme involved in *Loudermill*, the statute involved in this case (Ohio Rev.Code Ann. § 5123.16), articulates no reasons or circumstances justifying termination of the benefits it bestows. To the contrary, it imposes a mandatory duty on ODMRDD to bring its institutions in compliance with Title XIX standards and, correspondingly, bestows an absolute right upon plaintiffs to be placed in such an institution. Since there can be no reasonable justification or legitimate governmental purpose for ODMRDD's failure to perform this duty, its failure is *ipso facto* arbitrary.

The same result is obtained by pursuing a more recent line of judicial analysis. Recent decisions have indicated that a state official acts arbitrarily if he acts with something more than mere negligence, *e.g.*, if he acts deliberately or intentionally, *Daniels v. Williams*, 106 S.Ct. at 665, 667 n. 3, or with gross negligence, *Nishiyama v. Dickson County, Tennessee*, 814 F.2d at 282. In this case, defendants would be deemed to act intentionally if they had a conscious desire to allow the state institutions under their control fall below Title XIX standards, or if they knew that their action (or inaction) would be substantially certain to have that result. See ALI Restatement of the Law, 2d, Torts, § 8A. As stated by the Restatement:

> Intent is not ... limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.

*Id.*, Comment b.

Even if the defendants in this case had no conscious desire to deprive the plaintiffs

of their right to be placed in an institution meeting Title XIX standards, it seems apparent that they knew with substantial certainty that this would result from their failure to perform the duty imposed upon them by section 5123.16. Hence, their action (or inaction) must be deemed intentional and, thus, arbitrary.

For all of these reasons, the Court concludes that the complaint states a claim for violation of fourteenth amendment substantive due process.

### V.

For the reasons set forth in Part II of this decision, defendants' motion to dismiss the claim predicated upon the Medicaid provisions of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*, is hereby granted. In all other respects, defendants' motion to dismiss is hereby denied.

IT IS SO ORDERED.